Paul F. AHERN, d/b/a Ahern Associates, Plaintiff—Appellee,

v.

Donald Thomas SCHOLZ, Defendant—Appellant.

Paul F. AHERN, d/b/a Ahern Associates, Plaintiff—Appellant,

v.

Donald Thomas SCHOLZ, Defendant—Appellee.

Nos. 95–1146, 95–1147, 95–1203 and 95–1204.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 1995.

Decided June 4, 1996.

Donald S. Engel, with whom Mark D. Passin, Engel & Engel, Los Angeles, CA, Lawrence G. Green, Susan E. Stenger and Perkins, Smith & Cohen, Boston, MA, were on brief, for Donald Thomas Scholz.

David C. Phillips, with whom David M. Given and Goldstein & Phillips, San Francisco, CA, were on brief, for Paul F. Ahern.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

The parties in this breach of contract case, a successful musician and his former manager, dispute whether royalties from record albums have been accounted for and paid to each other. The appeal is from a final judgment by the district court after a jury trial, disposing of all claims in respect to all parties.

## BACKGROUND: A BAND OUT OF BOSTON

In this case, the parties dispute many of the facts and the inferences to be drawn from them. Thus we start with a sketch of the basic facts, and address the individual issues in more detail below. Appellant and cross-appellee Donald Thomas Scholz ("Scholz") is a musician, composer, and record producer who was, and is, a member of the musical group BOSTON ("BOSTON"). In late 1975, Scholz entered into three agreements with appellee and cross-appellant Paul F. Ahern ("Ahern"), who was engaged in the business of promoting and managing music groups, and his then partner, Charles McKenzie ("McKenzie") (collectively, the "1975 Agreements"). First, Scholz made a recording agreement (the "Recording Agreement") with Ahern and McKenzie d/b/a P.C. Productions, to which Bradley Delp, the lead singer of BOSTON, was also a party. Second was a management agreement (the "Management Agreement"), also between Scholz and P.C. Productions, under which

Ahern and McKenzie were appointed Scholz' exclusive personal managers worldwide. The third agreement was a songwriter agreement made between Scholz and Ahern, under which Scholz was obligated to furnish Ahern his exclusive songwriting services for a period of five years.

In early 1976, CBS Records ("CBS") and Ahern Associates, a business name of Ahern and McKenzie, entered into a recording agreement for the exclusive recording services of BOSTON. The group's first album (the "first album") was released in 1976, and sold approximately 11 million copies—one of the highest-selling debut albums ever. Its second album (the "second album") was released in August 1978, and sold approximately 6 million copies.

In 1978, Scholz and the other members of BOSTON entered into a modification agreement with Ahern and P.C. Productions, dated April 24, 1978. Among other things, the First Modification Agreement modified the 1975 Agreements and changed the financial relationship between Scholz and his managers. Ahern and McKenzie dissolved their partnership. A few years later, in May of 1981, Ahern and Scholz, individually and under various business names, entered into a further modification agreement (the "Further Modification Agreement" or "FMA"), which is at the heart of this dispute. Ahern ceased to be Scholz' manager.

In 1982, with the third album not yet released, CBS cut off the payment of royalties generated from the first and second albums. In 1983, CBS brought suit against Scholz, Ahern, and the members of BOSTON for failure to timely deliver record albums. Scholz' counsel in that action was Donald S. Engel ("Engel"); Ahern had his own counsel. While that litigation was pending, the third album was released by MCA Records ("MCA") in 1986 and sold well over 4 million copies. At the close of trial—seven years after the CBS litigation began—the jury found that Scholz was not in breach of contract. Scholz incurred legal fees of about $3.4 million dollars.

In February 1991, Ahern commenced this action against Scholz for breach of the FMA claiming a failure to pay royalties due under the third album. Scholz asserted various affirmative defenses and counterclaims against Ahern, including breach of the FMA. During trial, Engel, Scholz' lead trial counsel, was twice called as a witness. At the close of the evidence, the court granted Scholz' directed verdict dismissing Ahern's Count III for fraud and IV for breach of implied covenant of good faith and fair dealing. The court also granted Ahern's motion for directed verdict dismissing Scholz' First, Second, and Third Counterclaims and his, Third, Fourth, and Fifth affirmative defenses. Only the parties' respective breach of contract claims went to the jury. The jury found that Scholz breached section 5.2.1 of the FMA to pay Ahern royalties from the third album, and found that Ahern had not breached the FMA to account for and pay Scholz royalties due from the first and second albums. It awarded Ahern $547,007 in damages.

The trial court sitting without a jury also found Scholz had breached the FMA, and heard Ahern's Count II for declaratory relief and Count V for violation of Mass. Gen. L. ch. 93A and Scholz' Fifth Counterclaim for recision of contract for failure to obtain a license. The court denied the declaratory relief Ahern sought in Count I, and awarded him costs, interest and attorney's fees pursuant to Count V for violation of Mass. Gen. L. ch. 93A §§ 2 & 11. The court denied the relief sought by Scholz in his Fifth Counterclaim and held that he waived his Counts VI and VII at oral argument. After a hearing on Ahern's bill of costs and application for reasonable attorney's fees and interest, the court awarded Ahern $265,000 in attorney's fees and $135,000 in costs.

The district court denied, without a hearing, Scholz' motion for a new trial, motion to amend the court's memorandum and order and judgment entered thereon, motion to admit new evidence, and motion to amend the court's memorandum and order and the judgment entered thereon regarding Scholz' Sixth Counterclaim. This appeal followed.

## MOTION FOR A NEW TRIAL

Appellant first argues that the district court erred in denying his motion for a new

trial, made pursuant to Fed.R.Civ.P. 59(a). We therefore review the record below to determine whether the evidence required that the district court grant the motion for a new trial. *See de Pérez v. Hospital del Maestro*, 910 F.2d 1004, 1006 (1st Cir.1990). In reviewing the record of the 16–day trial, we note that both parties presented extensive evidence. The jury heard testimony regarding a history that spans two decades, involves at least seven contracts, includes detailed numerical accounting, and references more than half a dozen other legal battles. The parties called a total of fifteen witnesses, seven of whom, including Ahern, Scholz, and Engel, Scholz' counsel, testified twice. In short, the jury faced a complex and sometimes conflicting set of facts in making its decision as to whether either, neither, or both parties breached the 1981 Further Modification Agreement. Ultimately, we find that the jury's verdict was not against the clear weight of the evidence, and the district court did not abuse its discretion in so finding.

### A. Standard of Review

■■■ "A verdict may be set aside and new trial ordered 'when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice.'" *Phav v. Trueblood, Inc.*, 915 F.2d 764, 766 (1st Cir. 1990) (quoting *Torres–Troche v. Municipality of Yauco*, 873 F.2d 499 (1st Cir.1989)); *see* Fed.R.Civ.P. 59(a); *Sánchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 717 (1st Cir.1994). In reaching its decision, "the district court has broad legal authority to determine whether or not a jury's verdict is against the 'clear weight of the evidence.'" *de Pérez*, 910 F.2d at 1006. Nonetheless, "the trial judge's discretion, although great, must be exercised with due regard to the rights of both parties to have questions which are fairly open resolved finally by the jury at a single trial." *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *see Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 178–

79 (1st Cir.1988). Thus, the district court judge "cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial." *Milone*, 847 F.2d at 37; *see Coffran*, 683 F.2d at 6. "The mere fact that a contrary verdict may have been equally—or even more easily— supportable furnishes no cognizable ground for granting a new trial." *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1333–34 (1st Cir.1988).

■■■ Our review is circumscribed: we will disturb the district court's ruling on appellant's motion for a new trial only where there has been a clear abuse of discretion. *See Simon v. Navon*, 71 F.3d 9, 13 (1st Cir.1995); *Newell Puerto Rico, Ltd. v. Rubbermaid Inc.*, 20 F.3d 15, 22 (1st Cir.1994).

In order to determine whether such an abuse occurred here, we must review the record below. We do this not in the role of "a thirteenth juror," assessing the credibility of witnesses and weighing testimony, but rather to isolate the factual basis for the trial court's ruling and provide the foundation for our action today.

*Kearns*, 863 F.2d at 179. "So long as a reasonable basis exists for the jury's verdict, we will not disturb the district court's ruling on appeal." *Newell Puerto Rico, Ltd.*, 20 F.3d at 22.

With our standard of review established, we turn to Scholz' argument and the record below. We address each of the two breach of contract claims the jury decided in turn.

### B. Did Ahern Breach the FMA?

■■■ Scholz argues that Ahern breached his obligations under the 1981 FMA to both account for and pay to Scholz, every six months, his share of the royalties from the compositions on the first and second albums: indeed, Ahern admitted at trial that he had failed to make some payments he owed Scholz under the FMA. The jury and the trial court disagreed with Scholz, however, and found that Ahern's breach of the FMA was not material.[1] The question facing us,

---

1. Regarding substantial performance, the court's instructions to the jury stated that

The term "performance" contains within it substantial performance. Namely, if a person

then, is whether the district court abused its discretion in finding that the jury's decision was not against the weight of the evidence. After careful review of the record, we find no abuse of discretion in the lower court's decision not to disturb the jury's finding.

Scholz argues at some length on appeal that Ahern's breach was by definition material, both for his failure to account and his failure to pay. As for the first contention, we note that while Scholz' reading of the FMA as requiring that Ahern render Scholz direct accountings every six months is a convincing one, it is not the only plausible one. Indeed, Ahern contends that the FMA only required him to send irrevocable letters of direction to various entities involved directing them to send Scholz his share of the royalties when collected. In the end, it would not be against the clear weight of the evidence to find that letters of directions would satisfy Ahern's accounting obligations under the FMA, and that such letters were sent. Therefore, Ahern's failure to account every six months was not a material breach.

■■■ As for the second contention, Scholz supports his position that Ahern's failure to pay constitutes a separate, material breach by drawing on both New York[2] and Massachusetts case law. He points to the Second Circuit's refusal to overturn summary judgment in *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991). In that case, where plaintiffs failed to account and pay royalties in excess of $400,000, the court stated that

> the district court correctly concluded that the breach by plaintiffs in failing to make the payments and provide the reports required ... was material as a matter of law,

thus authorizing Marvel to terminate the contract. [The parties' agreement] explicitly singled out plaintiffs' obligation to provide "prompt accounting" for distributions as a term and condition of the agreement, the substantial breach of which authorized Marvel to terminate the license provided by the agreement. In addition, failure to tender payment is generally deemed a material breach of contract. Finally, as the district court found, and the subsequent accounting confirmed, the amounts withheld from Marvel by plaintiffs were very substantial.

*Id.* (citations omitted). Scholz also points to a New York case holding that a licensee's failure to pay franchise fees totalling $40,129 over four months constituted a breach of contract, *McDonald's Corp. v. Robert Makin, Inc.*, 653 F.Supp. 401, 402–04 (W.D.N.Y. 1986), as well as Massachusetts language indicating that "[a] material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract.'" *Lease-it, Inc. v. Massachusetts Port Auth.*, 33 Mass.App.Ct. 391, 600 N.E.2d 599, 602 (1992) (holding that six-month refusal to pay concession and rental fees was a material breach) (quoting *Buchholz v. Green Bros. Co.*, 272 Mass. 49, 172 N.E. 101 (1930)). Scholz argues that Ahern's breach, spanning thirteen years, is more egregious than these cases of a six-month failure to pay concession and rental fees, four-month failure to pay license and lease fees, and seven-month failure to pay (and five-month failure to account).[3] Therefore, Scholz concludes, Ahern's failure to pay Scholz at least $459,000 is clearly a substantial breach.

We are not convinced. We remind appellant that under our standard of review, we do

---

has substantially performed, that, in the eyes of the law, is full performance of one's obligations. So when I've used the term "performance" or "breach of the obligations," just include within those concepts the question of what is the definition of the term "substantial performance" or "substantial breach."

2. The FMA provides that it shall be "governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely in New York." "In the absence of a conflict of public policy, Massachusetts honors choice-of-

law provisions in contracts, and, in this diversity case, so must we." *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys., Inc.*, 986 F.2d 607, 610 (1st Cir.1993) (citation omitted). As we find no public policy issue is implicated by this private dispute, we respect the parties' choice-of-law provision. *See id.*

3. Scholz states that this is especially true here, where a transfer of copyrights are involved, and notes Ahern's admission that this imposed on him a heightened duty to account and pay royalties.

not sit as a juror, evaluating credibility and weighing evidence, as he seems to ask us to do. Rather, we simply weigh whether the district court committed a clear abuse of its discretion in determining that the jury verdict was not against the clear weight of the evidence. *Newell Puerto Rico*, 20 F.3d at 22; *Kearns*, 863 F.2d at 179. Our review of the record reveals that Ahern's counsel presented testimony questioning, to varying degrees, nine of the thirteen items of the estimate Scholz' accounting expert made of how much Ahern owed Scholz. Phillip Ames ("Ames"), a certified public accountant who served as business manager for both Ahern and BOSTON from 1976 through sometime in 1981 or 1982, made several estimates of how much Ahern owed Scholz, which he labelled "ball park figures." While we note that Ames' final estimate was $277,000, for a total of $459,000 with interest, we cannot assume that the jury accepted this figure as gospel. Given that Ahern sought over a million dollars in principal and interest from Scholz, the jury may reasonably have found that the Ames figure was not a substantial breach in the particular context of this case. It may have determined that the amount of money Ahern owed, taken in the perspective of the contract, Ahern's obligations, and the total amounts of money concerned, was not so significant a breach as to violate "an essential and inducing feature of the contract."

*Lease-It*, 600 N.E.2d at 602. Finally, addressing the case law Scholz relies on for support, we note that here, unlike in those cases, the amount of money owed was in question.

Ultimately, examining the record in full, the evidence clearly provides the jury and trial court with a basis for finding that Ahern did not substantially breach the FMA. As this Circuit stated on another occasion,

> We can understand how a jury might have decided for [defendant] on the basis of this evidence. But the jury did not do this; it decided for [plaintiff]. We do not see how one could say that the jury clearly made a mistake. We do not see how one could say that the evidence overwhelmingly favored the [defendant]. Rather, the evidence simply was mixed and contradictory.

*de Pérez*, 910 F.2d at 1008. Therefore we cannot say that the district court committed a clear breach of its discretion on this point.

## C. *Did Scholz Breach the FMA?*

Ahern claimed below that Scholz breached his obligation under section 5.2.1 of the FMA to pay Ahern his share of the royalties due from the third album.[4] The evidence presented at trial centered on a document entitled "Artist Royalty Statement" ("the Scholz Statement"), which Scholz presented to Ahern.[5] That statement listed over $6 mil-

---

4. That provision provided, in pertinent part,
 With respect to the future commercial release of any albums embodying the musical performance of the group "Boston" ..., Ahern shall be entitled to receive eighteen percent (18%) of gross royalties after deduction and payment of only (i) a producer's royalty to Scholz (computed according to the terms and provisions of the agreement between CBS and Ahern Associates, as amended, at a basic rate of six percent (6%) of the wholesale royalty base price) and (ii) all commercially reasonable recording expenses, including Tom Scholz' recording services (i.e. commercially reasonable engineering and other recording services), or recording expenses incurred by CBS or such other company and deducted from royalties payable....
 Because McKenzie was entitled to a percentage of the royalties, Ahern's actual rate was 12 percent.

5. In fact, Scholz sent Ahern two "Artist Royalty Statements," the first dated from inception to

June 30, 1990, the second from inception through December 31, 1993. We address the second here, as being more recent. It listed the following figures:

| | |
|---|---|
| Total Gross Royalties Reported by MCA Records | $6,604,048.14 |
| Gross Royalties—Audit Settlement | 170,000.00 |
| Less Producer Share | (2,257,862.05) |
| Gross Artist Royalties | 4,516,186.09 |
| less MCA Costs Deducted | 508,566.22 |
| less MCA Costs—Audit Settlement | (210,000.00) |
| less Artist Costs (Schedule 1) | 4,360,447.00 |
| Net Artist Royalties | (142,827.13) |

Of this final "Net Artist Royalties" figure, Ahern's percentage share was 12 percent, so that his share of the royalties was minus $17,139.26. "Artist Costs" included charges for 11,971 hours

lion in gross royalties reported by MCA prior to December 31, 1993, but reduced that figure by deducting, among other things, a producer share and artist costs, so that the net artist royalties fell to below zero—and Ahern was not entitled to any money. Scholz argued at trial that he did not breach the FMA, but the jury and the trial court disagreed.

■ On appeal, Scholz contends that their finding is against the weight of the evidence, because Ahern's prior material breaches excused Scholz' performance under the Further Modification Agreement. Scholz points out that paragraph 2 of the FMA states that

Scholz wishes to guarantee that Ahern shall receive at a minimum certain amounts of monies in connection with future recordings embodying the performances of the group "BOSTON" .... in exchange for the agreement of Ahern as set forth herein.

Scholz shapes his argument on appeal as follows: Since Ahern's only agreement of substance was his agreement to account for and pay royalties to Scholz for prior BOSTON albums, Ahern's breach of his commitment excused Scholz' performance. Indeed, Scholz notes, the parties' mutual commitments to account to and pay each other are expressly stated to be in consideration of each other. In such "bilateral contracts for an agreed exchange of performances, even though the promises are in form absolute, the law regards them as constructively conditioned in order to avoid an unjust result." *Industrial Mercantile Fac. Co. v. Daisy Sportswear,* 56 Misc.2d 104, 288 N.Y.S.2d 209, 211 (N.Y.Civ.Ct.1967), *order aff'd,* 56 Misc.2d 584, 289 N.Y.S.2d 332 (N.Y.Sup.Ct. 1968); *see* Restatement (Second) of Contracts, § 237 cmt. a (1979). Moreover, Scholz continues, the non-occurrence of a condition of a party's duty excuses the non-breaching party's obligation to perform even though that party does not know of its non-occurrence, *id.,* § 237 cmt. c, and the intention or scienter of a breaching party are not considered in the elements of breach of contract. *See Agron v. The Trustees of Columbia Univ.,* 1993 WL 118495 (S.D.N.Y., April 12, 1993).

■ Considering this, Scholz points out that his first royalty statement regarding the third album was rendered by MCA on April 1, 1987. Thus the earliest he could have owed money to Ahern under the FMA was August 15, 1987—and by that date, he argues, Ahern had already failed to account to Scholz or pay him royalties with respect to the first two albums for over five years. Therefore, Scholz maintains he was excused, at least until Ahern tendered payment, from rendering an accounting or paying royalties to Ahern from the third album. At the very least, Scholz argues, he could have withheld payment of the $459,000 admittedly owed him as a set-off against any amount he owed Ahern. *See Record Club of America v. United Artists Records, Inc.,* 80 B.R. 271, 276 (S.D.N.Y.1987), *vacated on other grounds,* 890 F.2d 1264 (2d Cir.1989).

In so arguing, Scholz does not contend that he did not in fact breach the FMA: he simply maintains that Ahern did so first. Since Scholz does not revisit the merits of the evidence presented at trial regarding his breach, we will not do so here.[6] However, since we have already found that the verdict that Ahern did not substantially breach the FMA was not against the clear weight of the evidence, Scholz' argument here must fail. Clearly, it would be inconsistent with our acceptance of the verdict that Ahern did not substantially breach the FMA to find that Scholz' performance was excused by Ahern's material breach. Accordingly, we affirm the district court's decision to refuse the motion for a new trial on this issue.[7]

of studio time in Scholz' studio at $125 an hour; engineering and equipment for the studio, at a total of $60 an hour; and $1.7 million in legal fees to Engel's law firm for the CBS litigation and negotiation of the agreement with MCA.

**6.** We note, however, that our review of the record convinces us that the verdict is not against the clear weight of the evidence, and so the

district court's ruling was not an abuse of its discretion.

**7.** Scholz argues, in a footnote, that the jury's verdict violates the premise that a party cannot recover more than he would have obtained had no breach occurred. However, we need not address his contention. Scholz provides no more than a couple of citations to flesh out his posi-

## D. *Sufficiency of the Evidence*

In a footnote, Scholz adds that he is appealing the verdict not only in terms of the denial of his motion for a new trial, as discussed above, but also that he appeals each of the jury's findings—i.e. that Scholz breached the FMA, that Ahern did not breach the Agreement, and that Ahern was entitled to damages—on the grounds of insufficiency of the evidence. Scholz relies on *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979), *cert. denied sub nom. Durham Distribs., Inc. v. Bombardier Ltd.,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980), to claim that our review of his alternative argument is limited to asking whether there is sufficient support in the record for the jury's finding.

*Engine Specialties* outlines the standard of review as follows:

> If we can reach but one conclusion after reviewing the evidence and all inferences drawn fairly therefrom in the light most favorable to the plaintiff (the prevailing party) and if that conclusion differs from the jury's, only then can the finding be set aside. Even if contrary evidence was presented and conflicting inferences could be drawn, it is for the jury to draw the ultimate conclusion, and such determination will not be disturbed unless the condition described above is met.

*Id.; see Fleet Nat'l Bank v. Anchor Media Television, Inc.,* 45 F.3d 546, 552–53 (1st Cir.1995) (outlining application of standard). We note that, in fact, this is the standard of review applicable to motions for judgment as a matter of law under Federal Rule of Civil Procedure 50. While it is a circumscribed review, it is nonetheless not as limited as our review of the district court's disposition of the motion for new trial. *See Sánchez,* 37 F.3d at 716–17 (comparing the two standards of review). We find nothing in the record to establish that appellant Scholz made a motion for judgment as a matter of law, so that he would be entitled to this less deferential standard of review. Rather, he argues sufficiency of the evidence in his motion for a new trial. Our review of the record, therefore, must be under the abuse of discretion standard outlined above. *See MacQuarrie v. Howard Johnson Co.,* 877 F.2d 126, 131 (1st Cir.1989) (noting that the strict "abuse of discretion" standard "is especially appropriate if the motion for a new trial is based on a claim that the verdict is against the weight of the evidence"); *Freeman,* 865 F.2d at 1341–43 (evaluating the weight of the evidence as part of a motion for a new trial, separately from its review of the denial of the motion for judgment notwithstanding the verdict).

Irrespective of which standard of review we apply, however, Scholz' alternative argument fails. First, the evidence was overwhelming that he breached the FMA by failing to pay Ahern his share of the royalties from the third album; indeed, Scholz does not attempt to argue otherwise. Second, although the issue of the materiality of Ahern's breach is fairly close, as discussed above, there was sufficient evidence in the record for the jury to determine that Ahern did not materially breach the Further Modification Agreement. Finally, having made these two determinations, the award of damages was appropriate. Therefore, given the scope of the evidence as described, we find that the district court's denial of appellant's motion for a new trial was amply supported and not an abuse of discretion.

## E. *The Length of the Jury Deliberations*

Scholz next contends that the jury failed to follow its instructions.[8] The district court

---

tion: he does not explain how the jury verdict places Ahern in a better position than he would have been if Scholz had not breached the FMA. It is by now axiomatic that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

8. The jury was instructed, in pertinent part, that:

> A party which has performed its obligations under a contract is entitled to have the other party do the same. Conversely, a party which has not performed its obligations under a contract is not entitled to performance from the other party. So once you understand the terms of the contract, you should determine

instructed the jury that damages could only be awarded if it found one party breached the FMA and the other did not. If it found that both parties were in breach, no damages could be awarded. In making his contention, Scholz reiterates his argument that the evidence was insufficient, emphasizing that Ahern admitted he did not perform his obligations under the FMA, and maintaining that Ahern's accountant admitted that he both failed to pay at least $459,000 to Scholz and mischaracterized an advance from a foreign sub-publisher as a loan. Under the jury instructions, Scholz argues, these factors preclude the jury from finding that Scholz breached the FMA, or at least from awarding Ahern any royalties. These contentions have been dismissed in our discussion above.

However, Scholz raises a new factor: he argues that the jury's verdict and the extremely short period of deliberations—one and a half hours[9] following fifteen days of testimony—reveal that the jury ignored the court's instructions and rendered an erroneous and inconsistent verdict. He cites the fact that one of the jurors planned to go on a cruise two days after the date of the verdict as proof that the jury was in a hurry to finish its deliberations. The jury's questions,[10] Scholz adds, demonstrates that it was determined to award Ahern $547,000 regardless of who was in breach. Between the insufficient evidence and the perfunctory deliberations, Scholz concludes, the district court had an affirmative duty to grant a new trial. He seeks support for his argument in *Kearns v.*

*Keystone Shipping Co.,* 863 F.2d 177 (1st Cir.1988), where this Circuit held that a brief jury deliberation—one hour and eighteen minutes, following a three-day trial—coupled with a verdict contrary to the great weight of the evidence created a situation where the district court had an affirmative duty to set aside the verdict. *Id.* at 182.

We remain unswayed. Scholz' reliance on *Kearns* is misplaced. There, the court explicitly required that the brief deliberation be paired with a verdict contrary to the weight of the evidence, noting that " '[i]f the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial.' " *Kearns,* 863 F.2d at 182 (quoting *Marx v. Hartford Accident and Indemnity Co.,* 321 F.2d 70, 71 (5th Cir.1963)). We have already determined that, here, there was evidence sufficient to support the verdict. Therefore, Scholz is merely left with a complaint that the jury should have deliberated longer. His complaint is easily defeated, as "no rule requires a jury to deliberate for any set length of time." *United States v. Peñagaricano–Soler,* 911 F.2d 833, 846 n. 15 (1st Cir.1990); *see United States v. Brotherton,* 427 F.2d 1286, 1289 (8th Cir.1970). Indeed, we have previously upheld a verdict on thirty-two counts which was reached in four hours, following a trial that lasted five weeks, incorporating more than fifty witnesses and hundreds of exhibits. *Peñagaricano–Soler,* 911 F.2d at 846; *see also United States v. Anderson,* 561 F.2d 1301, 1303 (9th Cir.) (holding that jury's brief deliberation does

---

whether any party has failed to perform any of the terms of the contract.

\* \* \*

If your determination should be that the defendant or defendant in counterclaim breached the contract and that the plaintiff or plaintiff in counterclaim did not, at that point . you would consider the issue of damages.

\* \* \*

If you find that both parties breached their obligations under the Further Modification Agreement, then no damages should be accorded to either party under the contract. (Day 15, pages 90–92).

9. For the purposes of this discussion, we accept Scholz' calculation of the time the jury spent deliberating its verdict.

10. The jury's questions, and the court's answers, were as follows:

Question No. 1, if neither breached, are damages awarded?

[Answer:] No.

[Question No. 2:] Verdict sheet uses the words, quote, "only if," unquote, in question three. I assume this precludes us from awarding damages or from awarding damage, one, if both breach.

[Answer:] If both breach, no damages. If neither breach, no damages.

[Question No. 3:] If one did, do we only take account from one side?

[Answer:] As I said, you would only consider the claim of the non-breaching party, but your judgment on that claim has to be based on all the evidence that has been introduced. (Day 15, page 104).

not indicate it did not give full and impartial consideration to the evidence), *cert. denied,* 434 U.S. 943, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *Brotherton,* 427 F.2d at 1289 (finding that jury deliberation of five to seven minutes did not demonstrate that jury did not consider court's instructions before reaching verdict).

■ We also refuse to read a determination to award Ahern a set amount of money from the jury's questions, which simply clarified where it could award damages, and whose evidence it should consider. *Cf. Clark v. Moran,* 942 F.2d 24, 32 (1st Cir.1991) (refusing to impute reasonable doubt of guilt or of witnesses' credibility from fact that jury deliberation was lengthy or from questions asked). Finally, we note that the jury's task was relatively simple. Although it heard complex testimony and was asked to weigh detailed evidence, the district court had already dismissed as a matter of law all the claims except for the respective contract claims, and the sums at issue had been clearly defined in the evidence and closing arguments.

### ENGEL'S TESTIMONY AT TRIAL

As noted above, Engel, Scholz' lead counsel, was called by both parties as a witness. Maintaining that Ahern called Engel as an expert witness, instead of a percipient witness, Scholz now argues that the district court committed prejudicial error by, first, permitting Ahern to do so, and second, by refusing to allow follow-up questioning by Engel's co-counsel, Passin.[11]

Our examination of each of Scholz' contentions follows the same legal framework. In each analysis, two questions face us: first, whether the district court erred in admitting or refusing the testimony or motion; and second, whether that error was harmful. *See Doty v. Sewall,* 908 F.2d 1053, 1057 (1st Cir.1990). Only if we answer both questions

in the positive will Scholz' argument on appeal prevail.

■ A trial court's error in an evidentiary ruling only rises to the level of harmful error if a party's substantial right is affected. *See* 28 U.S.C. § 2111; Fed.R.Evid. 103(a); *Lubanski v. Coleco Indus., Inc.,* 929 F.2d 42, 46 (1st Cir.1991). "In determining whether an error affected a party's substantial right, '[t]he central question is whether this court can say with fair assurance ... that the judgment was not substantially swayed by the error.'" *Espeaignnette v. Gene Tierney Co.,* 43 F.3d 1, 9 (1st Cir.1994) (quoting *Lubanski,* 929 F.2d at 46 (internal quotations omitted)). Factors we must consider in determining whether substantial rights are implicated include both the centrality of the evidence and the prejudicial effect of its exclusion or inclusion. *Lubanski,* 929 F.2d at 46. We weigh these factors in " 'the context of the case as gleaned from the record as a whole.'" *Id.* (quoting *Vincent v. Louis Marx & Co.,* 874 F.2d 36, 41 (1st Cir.1989)). We have repeatedly noted that "no substantial right of the party is affected where the evidence omitted was cumulative as to other admitted evidence." *Doty,* 908 F.2d at 1057. Should a reviewing court be in "grave doubt" as to the likely effect an error had on the verdict, the error must be treated as if it had in fact affected the verdict. *O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995) (noting that "by 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced as he feels himself in virtual equipoise as to the harmlessness of the error.").

We note that under Federal Rule of Evidence 103(a), we review the decision not only to determine whether a substantial right of the party is affected, but also to see whether a timely objection "appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Fed.R.Evid. 103(a)(1); *see Bonilla v. Yamaha Motors Corp.,* 955 F.2d 150, 153 (1st

11. Scholz also argues that, since Engel's testimony was "highly prejudicial" to Scholz, its improper admission is grounds for a new trial, citing *Conway v. Chemical Leaman Tank Lines, Inc.,* 687 F.2d 108 (5th Cir.1982) (upholding district court's grant of motion for new trial on

grounds of unfair surprise due to testimony from surprise expert witness). Since we find that the testimony was not in fact highly prejudicial to Scholz, this sparsely drawn alternative argument fails.

Cir.1992). Here, Scholz' counsel objected at the time of the challenged rulings. Therefore, this element of our analysis is not at issue.

Having established the legal framework, we examine each of Scholz' contentions in turn.

### A. *The Contested Testimony*

■ Phillips, Ahern's counsel, put Engel on the stand on the seventh day of trial. The objected-to portion of his questioning sought testimony regarding the Scholz Statement, which purported to account to Ahern for the royalties from the third album. In the Statement, Scholz deducted $1.7 million for legal fees charged by Engel's law firm, which the Statement listed as equivalent to half of the fees charged in relation to the negotiation of the agreement with MCA and the CBS litigation. The immediate issue at trial was whether this deduction was permissible as a "commercially reasonable recording expense" deductible from the royalties under section 5.2.1 of the FMA. Because the record is determinative of this issue, we quote it at length:

> Q. Now, as far as legal fees as recording costs are concerned, you've had some experience over the years, have you not, in reviewing the contracts of performing artists and groups in the musical field; is that right?
>
> A. Yes.
>
> Q. And could you give the Court and the jury some estimate of the number of contracts that you believe is an estimate that you reviewed over the period of time that you've been doing such matters in the entertainment field?
>
> A. Hundreds and hundreds and hundreds and more.
>
> Q. Okay.
>
> Have you ever seen legal fees as a recording cost in any of those hundreds and hundreds of contracts?
>
> MR. PASSIN: Your Honor, I object. He hasn't been called as an expert witness.
>
> THE COURT: Overruled.
>
> Do you mean, are you saying that he can't answer that question?

> THE WITNESS: No, your Honor, I would—
>
> THE COURT: Overruled. If you can't answer it, say you can't answer it.
>
> THE WITNESS: I can answer it, but it's a little awkward to call me as a witness, as an expert in my client's case.
>
> THE COURT: Overruled. You were advised that you were going to be called, and you said that you wished to stay in this case and your client was so advised. The objection has been made. Overruled.
>
> MR. ENGEL: At one point we said we wished to be out of the case. I think it should be clear. At one point we said out.
>
> THE COURT: Overruled.
>
> BY MR. PHILLIPS:
>
> Q. Do you have the question in mind, Mr. Engel? In the hundreds and hundreds of contracts that you've reviewed for performing artists such as Mr. Scholz and other groups in the music field, have you ever seen legal fees as a recording cost or expense?
>
> A. I have never seen legal fees—You mean designated in a contract?
>
> Q. Yes, as a recording cost or expense.
>
> A. No, I have never seen legal fees designated in a contract as anything, and certainly not as recording costs.

(Day 7, pages 71–73).

Scholz claims the district court erred in admitting the testimony over his counsel's objection, because Ahern's counsel was using Engel as an expert witness against his own client. First, he points out that Engel was not designated as an expert under Federal Rule of Civil Procedure 26. *See Prentiss & Carlisle Co. v. Koehring–Waterous Div. of Timberjack, Inc.,* 972 F.2d 6 (1st Cir.1992) (upholding trial court's refusal to hear expert testimony from witness not designated as an expert). Next, he maintains that under the applicable Rules of Professional Conduct, Engel should not have been required to testify against his client on an important and disputed point. *See* Model Code of Professional Responsibility DR 5–102(B). In turn, Ahern contends that the questions asked were not seeking Engel's expert opinion un-

der Federal Rule of Evidence 701,[12] or, in the alternative, that the district court acted within its discretion in admitting the testimony. *See Espeaignnette,* 43 F.3d at 10–11 ("Determinations of whether a witness is sufficiently qualified to testify as an expert on a given subject and whether such expert testimony would be helpful to the trier of fact are committed to the sound discretion of the trial court."); *United States v. Sepúlveda,* 15 F.3d 1161, 1183 (1st Cir.1993) (stating that manifest error standard applies to trial judge's rulings regarding expert testimony), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). His final contention is that Scholz' complaint should be deemed waived because Scholz first injected Engel's opinion testimony into the case through his affidavits.

We need not consider these arguments, however, for we find that, even assuming the trial court erred in admitting the challenged section of Engel's testimony, it was not harmful error. Essentially, the challenged evidence was that in the "hundreds and hundreds and hundreds and more" contracts that he has reviewed, Engel never saw "legal fees designated in a contract as anything, and certainly not as recording costs." (Day 7, page 73). Having examined the record as a whole to determine if admitting this evidence affected Scholz' substantial rights, in accordance with our legal framework, we find that any court error did not amount to harmful error.

First, although the issue of whether Scholz breached the FMA was certainly a major focus of the case, and Engel's testimony related to the single largest deduction taken from the royalties on the Scholz Statement, we disagree with Scholz' contention that it was probably determinative for the jury, for

several reasons. Ames and Stewart L. Levy ("Levy"), who has served as Ahern's counsel in the past and who was designated an expert on the subject of the reasonableness of the attorney's fees, both testified that attorney's fees are not recording expenses or recording costs. Ahern testified that they are not artist costs or expenses for recording purposes. We found no testimony, besides Engel's, contesting this point. Levy challenged the fees' inclusion on the Scholz Statement on another front as well, stating that Ahern was asked to pay for services that at times were working against his best interests, including time billed on motions to preclude a stipulation which would have had Sony or CBS dropping Ahern from the lawsuit. In short, he stated,

> We start off with the proposition that here is Mr. Ahern who is not directing Mr. Scholz to jump labels, not instructing Mr. Engel to do anything. Because Mr. Scholz decides to do what he is doing, not only does Mr. Ahern get sued by CBS, not only is Mr. Ahern's income from CBS cut off, now Mr. Scholz and his attorney, Mr. Engel, expect Mr. Ahern not only to accept that but to defray part of the cost of Mr. Engel doing this. I find that outrageous.

(Day 7, page 95). Engel testified that the attempt to keep Ahern in the case was not directed solely at him, but was part of an attempt to keep CBS from making deals with potential witnesses.

The fees were not disputed solely on the basis of the appropriateness of their deduction. Levy testified at length that the fees themselves were unreasonable. He testified that he felt that Engel's firm

> did the work without any regard to any kind of budget, without any cap on their work. Then they turned around and said,

---

12. We note in passing that we are skeptical both of Ahern's claim that Engel was not called as an expert and of Scholz' position that Engel was surprised at being questioned as an expert, in light of the following discussion, held immediately before Engel took the stand:

> MR. ENGEL: ... The other thing is this delicate situation. I'm an expert witness, right?
> MR. PHILLIPS: Yes.
> MR. ENGEL: So I'm being called as an expert?

> THE COURT: Which you were on notice.
> MR ENGEL: I understand.

(Day 7, pages 53–54). Despite Scholz' protestations in his brief that the reference to Engel as an expert must be a misstatement by Engel, an error by the court reporter, or based on something outside the reporter's hearing, it seems apparent to us that both parties foresaw the possibility of expert testimony being elicited. Indeed, the court's statement above suggests that it based its later ruling on the same premise.

he said we had carte blanche.... Suddenly when the case is over in 1990, we are told it is $3 million.... There were no parameters. Mr. Engel did what he wanted to do. No one was checking what he did to say it was too expensive, don't do it. (Day 7, pages 104–05). In turn, Engel testified that the fees were higher than originally estimated because the head of CBS personally pursued the litigation to the "bitter end," despite repeated attempts to settle. Ultimately, he maintained, Scholz prevailed and won moneys for the entire band—and Ahern.

In fact, the attorney's fees were not the only challenged deduction on the Scholz Statement. There was lengthy testimony questioning and defending many of the other deductions, most notably the producer's fee and the more than 11,000 hours of studio time Scholz charged for. Therefore, even if the jury felt the deduction of the attorney's fees—or of some of them—was appropriate, they could still have reasonably found that Scholz materially breached the FMA. Between the additional evidence, on both sides, as to whether the legal fees could be commercially reasonable recording expenses, whether the amount of fees charged were reasonable, and whether other deductions on the Statement were reasonable, we find that Engel's challenged testimony was not central to the case.

Second, the evidence admitted did not have an unduly prejudicial effect. When called to the stand by his co-counsel, Engel was able to clarify that, while he felt he was asked about "recording costs," the FMA actually addresses "recording expenses":

> Q. Does the—The first question, does the further modification use the term "recording costs"?
>
> A. My recollection is, the [F]irst Modification Agreement uses the term "recording expenses." I was asked about recording costs.
>
> * * *
>
> Q. Do recording contracts use the term "recording expenses" or "recording costs"?
>
> A. I, in all the recording contracts I've seen, in many of them, I don't remember the term "recording expenses" ever used,

it's always "recording costs" that I've seen in the clause.

(Day 13, pages 110–112). He followed up on this in his closing argument, stating that "[q]uestions were asked about recording costs, but recording costs is not the word used [in the FMA]." (Day 15, page 18). We find that this additional testimony by Engel counters the potential prejudicial effect of his challenged statement. Scholz argues on appeal that the prejudicial effect of the testimony was compounded by the statement of Ahern's counsel in his closing argument that

> there is no testimony before you, ladies and gentlemen, that legal costs in litigation that Mr. Scholz was in is a recording cost. In fact, to the contrary, the only testimony here has been that legal costs—legal fees and legal costs are not recording costs.
>
> You may recall Mr. Engel uncomfortably on the witness stand, after I qualified him on his expertise in matters of this sort, acknowledging that this was the case.

(Day 15, page 45). However, between the totality of the evidence at trial and the additional statements Engel himself made, both as witness and as counsel, we do not feel that this reference to Engel in the hour spent in closing argument by Ahern's counsel could be found to sway the jury's decision, prompting harmful error. *See Espeaignnette*, 43 F.3d at 9.

### B. *The Omitted Testimony*

 Scholz contends that the district court made a separate harmful error in upholding the objections made by Ahern's trial counsel when Engel's co-counsel called Engel to the stand on the thirteenth day of trial and tried to have him address his earlier testimony. After stating that the FMA used the term "recording expenses," not "recording costs," and reading out the pertinent section of the FMA, Engel's testimony continued as follows:

> Q. Have you seen contracts using only [the] words "recording costs" where artists were paid for legal fees?
>
> A. Yes.

Q. As an expert, how do you interpret recording expenses as it's used in the Further Modification Agreement?

MR. PHILLIPS: Objection.

THE COURT: Sustained.

THE WITNESS: Your Honor, I was asked—

THE COURT: Sustained.

Q. Does the language in the Further Modification Agreement—

THE COURT: He asked you a question, did you ever see it before? Your answer was no. Now you're saying—I won't allow any questions as to where you saw it.

THE WITNESS: He asked me, your Honor, I remember the exact question, because I answered it, he asked me about interpreting recording costs. Now, if he can ask me to interpret—

MR PHILLIPS: Objection, your Honor.

THE COURT: Sustained, sustained. Sustained.

THE WITNESS: Well—

BY MR. PASSIN:

Q. Does the—Does the language of the Further Modification Agreement affect other deductions you mentioned in [the Scholz Statements]?

MR. PHILLIPS: Objection. He's simply interpreting the agreement.

THE COURT: I'm going to sustain it.

THE WITNESS: Your Honor, could we have a side bar, because I think—

THE COURT: No. No.

Let's get going.

(Day 13, pages 112–14).

On appeal, Scholz argues that the court "apparently believed that it would be too prejudicial to Ahern to permit Engel to explain his apparently adverse expert testimony but that it was not too prejudicial to Scholz to permit Engel to testify adversely to Scholz in the first place, a horrendous conclusion." (Appellant's Brief, page 34). We disagree. The first time Engel testified, he was asked about "contracts of performing artists and groups in the musical field." (Day 7, page 71). He stated in the disputed testimony that he had "never seen legal fees designated in a contract *as anything*, and certain-

ly not as recording costs." (Day 7, page 73 (emphasis added)). When next called to the stand, Engel agreed that he *had* seen "contracts using only [the] words 'recording costs' where artists were paid for legal fees." (Day 13, page 112). The court's decision to sustain the objection made by Ahern's counsel in the ensuing dialogue was not a refusal to allow Engel to explain his evidence on the basis of its prejudicial effect against Ahern: it was evidently a reaction to the apparent inconsistency between these statements.

Essentially, on appeal Scholz maintains that Engel's co-counsel was not allowed to "cross-examine" him on the subject of his direct testimony for Ahern, thereby precluding him from presenting clarifying evidence or diminishing the "sting" of an attorney testifying against his own client. This error compounded the error of admitting Engel's expert testimony, Scholz contends. He complains that because of the court's ruling, the jury never got to hear Engel's testimony regarding other types of contracts, such as agreements between performers and managers, or the difference between "recording costs" and "recording expenses." Nor did they hear his explanation that his answer might differ if asked about "commercially reasonable recording expenses," not "recording costs," he notes. We view this final protest with some skepticism, however, in light of Engel's testimony on the stand that he had never seen legal fees designated "as anything," which would, presumably, include commercially reasonable recording expenses.

Assuming, *arguendo*, that Engel would have made the above testimony and that the district court erred in excluding the line of questioning, any resulting error was harmless. First, for the same reasons outlined above, the testimony, while related to a central issue, was not central in and of itself. Ames and Levy stated that they saw no difference between "recording costs" and "recording expenses." Additional testimony debated the total amount of fees charged as well as many other aspects of the Scholz Statement. As for the potential prejudicial effect, the testimony Engel was able to give, quoted above, made it clear that his earlier statement was directed to "recording costs,"

not "recording expenses," an argument he reiterated in his closing, mitigating the potential effect of the apparent inconsistency. Additionally, during his first day on the stand Engel stated, in response to questioning about the actual charging of recording costs or expenses by a group or a performing artist, that although he reviews accountings after the fact, he has never reviewed an accounting like that provided in the Scholz Statement. He testified that "[t]his is a special case. I don't remember any accounting that really falls into this category. This is not a standard contract." (Day 7, page 81). While this testimony does not go directly to his prior statements, it does emphasize that the FMA is not a standard contract, implying that his and others' statements about other contracts may not be pertinent. Weighing the above in the light of the record as a whole, *see Doty*, 908 F.2d at 1057, we cannot say that the court's evidentiary ruling excluded evidence that was either central or prejudicial in its effect such that it could have swayed the factfinders' decision. Thus, even if the court erred, it did not rise to the level of harmful error. *See Lubanski*, 929 F.2d at 46.

## C. *The Overall Impact of Engel's Testimony*

█ Of course, it is not just the impact of the information elicited from Engel that we must evaluate under the harmless error standard. We must also address the potential prejudicial effect on the jury of seeing Engel, Scholz' counsel, take the stand, dispute with the court and opposing counsel over his testimony, and finally make a statement, apparently unwillingly, against his client's interest—a statement against which, he argues, he had to take an apparently inconsistent position in his closing argument. There is no doubt in our mind that this had some prejudicial effect on the jury. Nonetheless, we cannot say with " 'fair assurance . . . that the judgment was [ ] substantially swayed by the error.' " *Espeaignnette*, 43 F.3d at 9 (quot-

ing *Lubanski*, 929 F.2d at 46). The jury sat through fifteen days of trial, received substantial and often cumulative testimony on all points,[13] and heard an hour of closing argument from each party's counsel. We find it highly unlikely that the verdict could have been the result of Engel's questioning and the attendant commentary. *Cf. United States v. Rosales*, 19 F.3d 763, 768 (1st Cir. 1994) (holding that prosecutor's inappropriate argument in closing did not warrant new trial under harmless error standard).

There are significant reasons why trial counsel should not be able to testify at trial, no matter for which party counsel testifies.

The principal ethical considerations to a lawyer testifying on behalf of his client regarding contested issues are that the client's case will "be presented through the testimony of an obviously interested witness who is subject to impeachment on that account; and that the advocate is, in effect, put in the unseemly position of arguing his own credibility."

*Siguel v. Allstate Life Ins. Co.*, 141 F.R.D. 393, 396 (D.Mass.1992) (quoting ABA Comm. on Ethics and Professional Responsibility, Formal Op. 339 (1975)). "Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between lawyer and client." Model Rules of Professional Conduct Rule 3.7 cmt. 1. When the attorney is called to the stand by his client's opponent, the concerns are just as substantial, if not more. *See Siguel*, 141 F.R.D. at 396 ("Although there are degrees of adverse testimony, there are few, if any, situations that justify acceptance or continued employment in this circumstance."). Accordingly, Model Rule of Professional Conduct 3.7 states that a lawyer shall not act as advocate at a trial where he or she is likely to be a necessary witness, except, among other things, where the testimony relates to an uncontested issue or disqualification of the attorney would work substantial hardship on the client. Finally,

---

**13.** Indeed, the evidence was so redundant that the court was prompted to exclaim that

in all my years, I have never seen a case in which the same matters have come up so many times. The accumulation of evidence in this

case is really burdensome. . . . I'm telling you, I've told you many times, I don't know how much longer I can take cumulative evidence. (Day 13, pages 89–90).

there is also the danger that the performance of the dual roles of counsel and witness will create confusion on the jury's part as to when the attorney is speaking as a witness, "raising the possibility of the trier according testimonial credit to the prosecutor's closing argument," *United States v. Johnston*, 690 F.2d 638, 643 (7th Cir.1982)—or, conversely, weighing the testimony as if it were argument.

All these concerns clearly come into play at a more heightened level when trial counsel acts as an expert. However, when counsel is asked to play that role for the length of one question in a fifteen-day trial, even acknowledging the impact of the attendant discussion with the court, attempts to examine him on the testimony and references to it in the closing arguments, we cannot hold that it rises to the level of harmful error affecting a party's substantial right where the testimony is cumulative and not a central part of the case. Any prejudice that resulted from the objected-to portions of Engel's testimony did not rise to the level of harmful error.

### D. *Denial of Pre–Trial Motion for Continuance*

 Prior to trial, Ahern filed two motions seeking to disqualify Engel as Scholz' counsel on the grounds that Engel was a percipient witness who ought to testify on Scholz' behalf. Scholz opposed, and the district court refused, both motions. When the parties presented their lists of witnesses, Engel appeared on both parties' lists. Approximately six weeks before trial was scheduled to begin, Ahern filed a third motion to disqualify. This time Scholz agreed to withdraw his counsel provided that he was given time to find new lead counsel. In his memorandum in support of his motion, Scholz stated that he "now [felt] he must retain new trial counsel in this matter, to avoid the risk of a disqualification of his counsel just prior to the trial, and for other reasons." (Scholz' Memorandum in Support of His Motion to Continue Trial, page 3). The district court, however, denied both Ahern's Renewed Motion to Disqualify and Scholz' Motion to Continue Trial.

As discussed above, Scholz maintains in his brief on appeal that the trial court erred by allowing Ahern to use Engel as his own expert against Scholz. One of the four contentions he uses to support this position is that

the trial court itself placed Scholz in his precarious predicament when it refused to grant the last motion by Ahern to disqualify Engel.... The failure to grant the continuance under these circumstances, which resulted in severe prejudice to Scholz, is, itself, reversible error.

(Appellant's Brief, page 34). In support of his statement, Scholz cites several cases weighing district court decisions on motions for continuances. *See Lowe v. City of East Chicago*, 897 F.2d 272, 274–75 (7th Cir.1990) (concluding that it was an abuse of discretion to deny motion for continuance where plaintiff was faced with choice between voluntary dismissal and going to trial although his attorney was not ready for trial); *United States v. Flynt*, 756 F.2d 1352, 1358–59 (9th Cir.) (finding that district court abused its discretion in denying motion for continuance where doing so effectively foreclosed defendant from presenting a defense), *amended*, 764 F.2d 675 (9th Cir.1985). We need not prolong our discussion. Simply put, we do not feel the district court abused its discretion in denying the motion for a continuance. Even if it did, the error was harmless.

Finally, we note that while we ultimately hold that the court did not commit harmful error in making its evidentiary ruling, we find it very disturbing that trial counsel testified in this case. In making his appeal, Scholz directs us to a series of cases, several of which are referenced above, which lay out the real and serious concerns implicated by allowing counsel to testify at trial. *See, e.g., United States v. Dack*, 747 F.2d 1172, 1172 n. 5 (7th Cir.1984) ("Where evidence is easily available from other sources and absent 'extraordinary circumstances' or 'compelling reasons,' an attorney who participates in the case should not be called as a witness."). We ask whether Scholz and his counsel read these cases before opposing Ahern's first two motions to disqualify. The concerns the cases voice are implicated whether counsel

testifies for his or her own client or for the opposing party. What is more, even if Engel testified solely as to ministerial matters, we still doubt the wisdom of allowing him on the stand, as the matter of his firm's legal fees— not only whether, as a whole, they were commercially reasonable recording expenses but also whether they were reasonable at all—was a matter of testimony. The jury heard deposition testimony from Ahern's expert Levy that the legal fees from the CBS litigation were, among other things, "excessive and totally inappropriate" (Day 7, page 86); whether Engel was called to the stand by Scholz or Ahern, indeed, even had he never testified, his integrity and judgment could have been questioned by the factfinders.

## COUNTERCLAIM FOR FRAUD AND DECEIT AND AFFIRMATIVE DEFENSES

The Further Modification Agreement provided that Ahern was entitled to a share of the royalties of any album completed before October 24, 1984. Had the parties adhered to this provision, Ahern would not be entitled to any moneys from the third album, as it was completed after that date. Instead, Scholz waived the deadline, conveying his waiver through communications between the parties' attorneys in May of 1984. In this action, Scholz drew on his waiver of the deadline in his third counterclaim and several of his affirmative defenses to argue for rescission of the waiver agreement on the grounds of fraud and deceit and, alternatively, its invalidation. On appeal before us, he appeals the district court's directed verdict against him on these claims.

Our standard of review is a familiar one. A motion for judgment as a matter of law "should be granted only when the evidence, and the inferences to be drawn therefrom, viewed in the light most favorable to the nonmovant . . . could lead reasonable persons to but one conclusion." *MacQuarrie*, 877 F.2d at 128 (quoting *Dopico–Fernández v. Grand Union Supermarket*, 841 F.2d 11, 12 (1st Cir.), *cert. denied*, 488 U.S. 864, 109 S.Ct. 164, 102 L.Ed.2d 135 (1988)). We review the district court's directed verdict *de novo*. *See Fleet Nat'l Bank*, 45 F.3d at 552. Accordingly, " 'we use the same stringent decisional standards that control the district court.' " *Gallagher v. Wilton Enter., Inc.*, 962 F.2d 120, 125 (1st Cir.1992) (quoting *Hendricks & Assocs., Inc. v. Daewoo Corp.*, 923 F.2d 209, 215 (1st Cir.1991)).

### A. Rescission

In his Third Affirmative Defense and Third Counterclaim, Scholz sought recision of the waiver agreement on the grounds that Ahern fraudulently induced him to enter into the agreement by not disclosing that he had neither accounted for nor paid, since at least 1981, the royalties he owed Scholz under the FMA. Under New York law, applied here pursuant to the FMA choice of law provision, a party seeking to prove common law fraud must show that:

> (1) the [cross-]defendant made a material false representation, (2) the [cross-] defendant intended to defraud the [cross-] plaintiff thereby, (3) the [cross-] plaintiff reasonably relied upon the representation, and (4) the [cross-]plaintiff suffered damage as a result of such reliance.

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995) (analyzing elements in context of claim for rescission based on fraud); *see also Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir.1994). The first element may be met by demonstrating not only a misrepresentation, but also a concealment or nondisclosure of a material fact. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Bickhardt v. Ratner*, 871 F.Supp. 613, 618 (S.D.N.Y.1994). In addition, the party claiming fraudulent concealment must demonstrate that the opposing party had a duty to disclose the material information in question and demonstrate each element of the claim by clear and convincing evidence. *See Banque Arabe et Internationale D'Investissement*, 57 F.3d at 153. We begin our analysis by weighing what duty Ahern owed Scholz, and then turn to the elements listed above, ultimately concluding that the district court erred in directing a verdict.

In the instant case, Scholz argues that Ahern owed Scholz a duty to disclose

because he was a fiduciary. *See Brass v. American Film Techs.*, 987 F.2d 142, 150 (2d Cir.1993). Ahern contests that at the time the waiver was given in May 1984, the Management Agreement had terminated and so there was no fiduciary duty and, thus, no duty to disclose. "Under New York law, a fiduciary relationship includes 'both technical fiduciary relations and those informal relations which exist whenever one [person] trusts in, and relies upon, another.'" *Allen,* 945 F.2d at 45 (quoting *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904–05 (1976)); *see Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 529 N.Y.S.2d 279, 283 (1988) (noting that fiduciary relationship can be found between close friends or where confidence is based upon prior business dealings). "New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Litton Inds., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992).

Scholz points us to the decision in *Apple Records, Inc. v. Capitol Records, Inc.,* where the court found that plaintiffs, the New York corporation of the Beatles, stated a claim that a fiduciary relationship existed.

> The business dealings between Capitol Records and the Beatles date back to 1962, when the still unacclaimed Beatles entrusted their musical talents to defendant Capitol records. It is alleged that this relationship proved so profitable to defendant that at one point the Beatles constituted 25 to 30 percent of its business. Even after the Beatles attained their remarkable degree of popularity and success, they still continued to rely on Capitol Records for the manufacture and distributing of their recordings. It can be said that from such a long enduring relationship was borne a special relationship of trust and confidence, one which existed independent of the contractual duties, and one which plaintiffs argue was betrayed by fraud....

529 N.Y.S.2d at 283. Like the parties in *Apple Records,* at the time of the waiver in 1984 Ahern and Scholz had a long history of business dealings, marked by a series of agreements and modification agreements. Also as in that case, the relationship between the parties here was a profitable one for Ahern. However, unlike that case, Ahern no longer, as of several years previously, was Scholz' manager. Indeed, Scholz testified that in 1978, when he first started the process that culminated in the FMA, he was no longer on speaking terms with Ahern. While we do not doubt—and Ahern admitted at trial—that Ahern had a fiduciary duty to Scholz until 1981, the question remains whether there was such a special relationship of trust and confidence between the parties at the time of the waiver that a fiduciary relationship, at least as regards Ahern's duty to pay Scholz' share of the royalties from the first and second albums, remained. Since a reasonable juror could find that it did, however, a directed verdict is inappropriate on the question of whether Ahern owed Scholz a fiduciary duty. Therefore, we continue our analysis and turn to the evidence presented on the elements listed above.

 First, as for the material false misrepresentation or nondisclosure, it is undisputed that Ahern did not disclose his failure to pay, a fact which a reasonable juror could easily find material. On the other hand, both Ahern and Barbara Sherry ("Sherry"), who provided business management services for Ahern and BOSTON while Ames served as their business manager and served as Ahern's business manager from 1982 up through the time of trial, testified that they were not aware money was owed until after the waiver was made, and Scholz points to no evidence of concealment. Second, Scholz would have us read an intent to deceive into Sherry's testimony agreeing with Engel's statement that today, looking at a royalty statement from the company charged with administrating the publishing, "it's immediately plain to anyone who knows this business, that [the administration company] was not paying" the proper percentage to Scholz. (Day 6, pages 61–62). Scholz cannot rely on this as an admission that Sherry knew Scholz was not receiving all his moneys, however, since her actual testimony was that she did not know of the failure at the time. Instead, he seeks to build on her admission that one

could have known from the face of the royalty statements that there was an error, as well as the fact that there was no evidence that letters of direction were prepared for the foreign sub-publishers, to support his contention that Ahern "had to have known" he was not making all his payments. Ahern presented no evidence indicating that he could not have known of the error, just that he did not. In essence, therefore, determining whether Ahern intended to deceive Scholz becomes an issue of credibility, one which of necessity is a question for the jury.

As for whether Scholz reasonably relied on Ahern's nondisclosure, his case is damaged by the fact that the evidence is undisputed that Ahern did not actually solicit the waiver. Scholz' attorney contacted his counsel and offered it to him. Scholz explained his motivation at trial:

> A. Well, I figured if I, if I finished the record six months later and I missed that date that Paul Ahern was entitled to his 12 percent of the royalties, you know, I missed that date and then six months later delivered the record, I was sure he would be upset about that and, and want his 12 percent anyway, and I didn't want to fight with him.
>
> Q. And was it your intention at that time—
>
> A. I had enough trouble at that point.
>
> Q. And did you ask for anything in return for that waiver?
>
> A. No.

(Day 10, pages 38–39). However, Scholz points to his testimony at trial that he "obviously" would not have agreed to the waiver had he known of Ahern's failure to pay him publishing royalties as evidence of his reliance. Giving Scholz the benefit of all the inferences, a reasonable juror could find under these circumstances that Ahern sought to induce Scholz into a fraudulent agreement, once it had been offered to him, through nondisclosure of his failure to pay. The presence of the fourth element, damages, Scholz contends, is witnessed by the fact that he now owes Ahern money: had he not waived the deadline, Ahern would not have been entitled to royalties from the third album. Given all of the above, we find that

Scholz has mustered sufficient evidence for the issue to go to the jury.

**B. *Invalidation of the Waiver***

■ In his Fourth and Fifth Affirmative Defenses, Scholz argues that the waiver should be invalidated because he did not knowingly give his consent. He maintains here that in order to prevail, all he must prove is that he would not have agreed to the waiver if he had known of Ahern's failure to account to and pay him royalties. Since he testified to that effect, he argues, the district court erred in granting a directed verdict. We disagree. First, we note that none of the cases Scholz looks to for support discuss invalidation as an affirmative defense under Federal Rule of Civil Procedure 8(c). Although the case law indicates that there is precedent for such an affirmative defense, *see, e.g., United States v. Krieger,* 773 F.Supp. 580, 583 (S.D.N.Y.1991) (denying summary judgment on, *inter alia,* claim for invalidity of guarantees despite failure to claim it as an affirmative defense), we have found, and the parties present, no comprehensive discussion of its nature. *See* 2A James Wm. Moore et al., *Moore's Federal Practice* ¶ 8.27[4] n.6 (2d ed.1995) (listing most common affirmative defenses, excluding invalidity).

We find no other support for Scholz' position in the cases he cites. *Allen,* which he looks to for the proposition that all he has to prove is that he would not have agreed to the waiver, does not address invalidity of a waiver or release. Rather, it notes that a court may *rescind* a release " 'where it finds either mutual mistake or one party's unilateral mistake coupled with some fraud ... of the other party.' " *Allen,* 945 F.2d at 44 (quoting *National Union Fire Ins. Co. v. Walton Ins. Ltd.,* 696 F.Supp. 897, 902 (S.D.N.Y.1988)). Scholz did not plead mutual mistake, and his rescission claim based on fraud is addressed above.

Scholz states that he does not have to show Ahern owed him a fiduciary duty in order to state a claim for invalidation. Indeed, the court in *Allen* notes that where one party has superior knowledge not available to the other party, a duty to disclose may arise, apparent-

ly exclusive of a fiduciary duty, *id.* at 45, but Scholz does not point to any evidence that he could not have discovered that Ahern had not been paying him. His reliance on *Gishen v. Dura Corp.*, 362 Mass. 177, 285 N.E.2d 117 (1972), apparently for the proposition that "[a] party cannot waive information with respect to an error in calculation whose existence is unknown to him, particularly where his ignorance is caused by the very lack of disclosure in question and where the parties are not fully at arm's length," *id.* 285 N.E.2d at 122, is misplaced. First and most importantly, under the choice-of-law provision of the FMA, the parties here are applying New York, not Massachusetts, law. Second, the *Gishen* opinion addressed a request for a jury instruction on waiver, which was denied because the party had not previously presented the argument; it does not involve an affirmative defense. *Id.* at 121. The quoted language is dicta—and seems to undercut Scholz' proposition that a fiduciary relationship is not necessary.

Scholz' citation to *Werking v. Amity Estates, Inc.*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956), also proves unfruitful. There, the court defines a waiver as "'the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'" *Id.* 155 N.Y.S.2d at 639, 137 N.E.2d at 327 (quoting Whitney on Contracts 273 (4th ed.1946)). The court found the waiver in question, of jurisdictional defects in a tax sale of plaintiff's farm, invalid because plaintiff "had no knowledge of the right he is charged with having knowingly and intentionally relinquished." *Id.* Here, however, Scholz knew exactly what right he was relinquishing: the right not to pay Ahern 12 percent of the royalties from the third album.

## MASSACHUSETTS LAW CLAIMS

We next turn to Ahern's claim against Scholz under Massachusetts General Law Chapter 93A, sections 2 and 11 ("Chapter 93A"). The district court found that Scholz' failure to pay royalties as provided in the FMA violated Chapter 93A. More specifically, it held that the Scholz Statement regarding the royalties on the third album constituted an unfair and deceptive business practice, and that it was a "deliberate and blatant attempt to deprive Plaintiff Ahern of moneys rightfully due and owing to him." (District Court Memorandum and Order, page 3). The court awarded Ahern $547,000 as well as costs, interest, and reasonable attorney's fees.

Scholz now contends that his actions do not rise to the level of unfair or deceptive trade practices within the meaning of Chapter 93A. Section 11 of Chapter 93A provides a cause of action to

> [a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment of another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice. . . .

Mass. Gen. L. ch. 93A, § 11.[14] We begin with our standard of review; once it is established, we address Scholz' attack on the sufficiency of the district court's findings, and his contention that his acts did not rise to the level of "rascality" courts require of Chapter 93A violations. *See Quaker State Oil Ref. Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989). Because we ultimately find that the district court erred as a matter of law in finding that Scholz violated Chapter 93A, we need not address the defenses Scholz raises to the application of that Chapter.

### A. *Standard of Review*

We review the district court's findings of law *de novo,* and only set aside its findings of fact if "clearly erroneous." *See Industrial Gen. Corp. v. Sequoia Pacific Sys. Corp.*, 44 F.3d 40, 43 (1st Cir.1995); *see, e.g., Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17 (1st Cir.1985). "A finding of fact is '"clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left

**14.** Section 2, which is also referred to in the current action, establishes that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Mass. Gen. L. ch. 93A, § 2.

with the definite and firm conviction that a mistake has been committed.'" *Industrial Gen.*, 44 F.3d at 43 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted)). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 578 N.E.2d 789, 803 (1991), *rev'd on other grounds*, 412 Mass. 703, 592 N.E.2d 1289 (1992).

### B. *The District Court's Findings*

The district court determined that Scholz had violated sections 2 and 11 through his failure to pay Ahern royalties from the third album, and made the following findings in its Memorandum and Order. First, it found that Scholz agreed to pay Ahern royalties after deduction of only a producer's royalty and all commercially reasonable recording expenses. Second, the court held that the Scholz Statement constituted an unfair and deceptive business practice. More specifically, it found that the deductions taken for legal fees, payment to Jeff Dorenfeld, time spent in the studio, and the resulting recording costs were all not commercially reasonable recording expenses. Rather, the court stated, $500,000 in recording expenses would be commercially reasonable. It next found that Scholz' Statement was

> a deliberate and blatant attempt to deprive the Plaintiff Ahern of monies rightfully due and owing to him as royalties from the sales of the third BOSTON album. Such egregious conduct ... is patently an unfair and deceptive practice. The submission of [the Scholz Statement] as an accounting by Scholz to Ahern is a shocking display of arrogant disdain for Ahern's contractual rights and was rendered in obvious bad faith.

(District Court Memorandum and Order, page 3).

Scholz challenges the sufficiency of these findings. Federal Rule of Civil Procedure 52(a) mandates that courts "find the facts specially and state separately [their] conclusions of law thereon" when trying facts without a jury. *See, e.g., Montañez v. Bagg*, 24 Mass.App.Ct. 954, 510 N.E.2d 298, 300 (1987) (noting that judge did not make detailed findings of fact regarding Chapter 93A claims under Mass. R. Civ. P. 52(a)). Scholz notes that the court did not state that the deductions were actually deceptive, and reminds us that the Scholz Statement set forth in some detail what each of the deductions were. Since the court did not make more specific findings as to unfair or deceptive practices, he maintains, we should reverse the Chapter 93A finding against him.[15] *See Schwanbeck*, 578 N.E.2d at 803 (holding that district court finding of Chapter 93A violation lacked foundation in the court's subsidiary findings).

However, we remind Scholz that under Rule 52(a) "the judge need only make brief, definite pertinent findings and conclusions on the contested matters." *Makuc v. American Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir.1987). Here, the district court found that Scholz breached the FMA, that four of his deductions were commercially unreasonable, while a figure of $0.5 million would be reasonable; and that the Scholz Statement was "a deliberate and blatant attempt to deprive" Ahern of moneys owed him. It is a question of law whether this attempt to deprive Ahern rises to the level of a violation of Chapter 93A, as the lower court held, and we believe the decision includes enough of a basis for the Chapter 93A finding to save the decision from remand. The district court has provided us with more than mere conclusions. *See Sidney Binder, Inc.*, 552 N.E.2d at 572 (holding that explanatory findings were necessary where court merely recited the evidence without making findings and concluded that "neither party ha[d] sustained its burden of proof" that Chapter 93A had been violated). We note, however, that our task would have been much simpler in this and other issues

---

**15.** We note that, contrary to Scholz' position, were we to find that the district court did not lay out sufficient findings of fact, we would likely remand so that the lower court could make subsidiary findings of fact and enter a new judgment on the basis of its findings. *See, e.g., Sidney Binder, Inc. v. Jewelers Mut. Ins. Co.*, 28 Mass. App.Ct. 459, 552 N.E.2d 568, 572 (1990).

had the district court seen fit to explicate more of its decision-making on paper. There is a gap between finding that deductions are commercially unreasonable and finding that the Scholz Statement as a whole is an attempt to deprive Ahern deserving of the modifiers "unfair" and "deceptive": while we are willing to follow the lower court across the distance between them, a bridge would have been more than welcome.

### C. *Scholz' Challenge to the Chapter 93A Findings*

Having set forth our standard of review and the findings of the district court, we turn to the heart of Scholz' challenge to the Chapter 93A award. As noted above, whether an act was unfair and/or deceptive is a question of fact. Based on our review of the evidence, we do not hesitate to find that the district court's findings of fact are not clearly erroneous, and we will not disturb them.[16] *See United Truck Leasing Corp. v. Geltman*, 26 Mass.App.Ct. 847, 533 N.E.2d 647, 653 (1989), *aff'd*, 406 Mass. 811, 551 N.E.2d 20 (1990). Thus, we assess the lower court's award under Chapter 93A in the light of its finding that four deductions—which totalled $4.2 million—were not reasonable, but $0.5 million would be commercially reasonable recording costs, and that the Scholz Statement was a deliberate attempt to deprive Ahern of his percentage of the royalties from the third album. We ask now whether these facts rise to the level of a violation of Chapter 93A, section 11.

 There is no clear definition of what conduct constitutes an "unfair or deceptive" act. Mass. Gen. L. ch. 93A, § 11. The Massachusetts courts "have noted, however, that '[t]he statute "does not contemplate an overly precise standard of ethical or moral behavior. It is the standard of the commercial marketplace." ' " *Shepard's Pharmacy, Inc. v. Stop & Shop Cos.*, 37 Mass.App.Ct. 516, 640 N.E.2d 1112, 1115 (1994) (quoting *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass.App.Ct. 108, 546 N.E.2d 888 (1989)), *review granted*, 419 Mass. 1102, 644 N.E.2d

226 (1994). In the extensive case law on Chapter 93A, "a common refrain has developed. 'The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Quaker State*, 884 F.2d at 1513 (quoting *Levings v. Forbes & Wallace Inc.*, 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979)). In short,

> a chapter 93A claimant must show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," or were "immoral, unethical, oppressive or unscrupulous," and resulted in "substantial injury ... to competitors or other businessmen."

*Id.* (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). In evaluating whether an act or practice is unfair, we assess "the equities between the parties," including what both parties knew or should have known. *Swanson v. Bankers Life Co.*, 389 Mass. 345, 450 N.E.2d 577, 580 (1983).

 It is well established that breach of a contract can lead to a violation of Chapter 93A. *See, e.g., Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 821 (1991). The simple fact that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation, however. *Cf. Pepsi–Cola Metro. Bottling Co.*, 754 F.2d at 18 (stating that "mere breaches of contract, without more, do not violate [C]hapter 93A."). In the breach of contract context, the Massachusetts Supreme Judicial Court has "said that conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for [Chapter] 93A purposes." *Anthony's Pier Four*, 583 N.E.2d at 821; *see Wang Labs., Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 501 N.E.2d 1163, 1165 (1986). Relying on the Appeals Court of Massachusetts' decision in *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 598 N.E.2d 666 (1992), Scholz seeks to limit this test. There,

---

**16.** Scholz argues at length in his breach that the facts do not support a finding that his acts were unfair or deceptive. We decline, however, to

enter into the record yet again to point to testimony and evidence refuting his contentions.

the court examined a series of breach of contract cases and concluded that

> [t]here is in those cases a constant pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness. In the absence of conduct having that quality, a failure to perform obligations under a written lease, even though deliberate and for reasons of self-interest, does not present an occasion for invocation of [Chapter] 93A remedies.

*Id.,* 598 N.E.2d at 670–71 (citation omitted). We have not addressed, and find no Massachusetts case law addressing, whether this language from *Atkinson* extends beyond its immediate context to limit award of Chapter 93A damages in breach of contract cases to cases with an "extortionate quality." *See NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 33 (1st Cir.1994) (quoting *Atkinson* and accepting, *arguendo,* that "in a breach of contract situation, liability does not attach under [Chapter] 93A, section 11 unless a defendant knowingly breached a contact in order to secure additional benefits to itself to the detriment of a plaintiff.").

■■■ We need not do so today, however. First, if we accept the test for Chapter 93A violation Scholz claims *Atkinson* frames, the district court's award here will not stand because there has not been an extortionate element to the breach: Scholz tried to hold on to Ahern's money, but he was not using the breach "to force [Ahern] to do what otherwise [he] would not be legally required to do." [17] *Pepsi–Cola Metro. Bottling Co.,* 754 F.2d at 18 (affirming Chapter 93A award where defendant withheld payment as a "wedge" to force plaintiff to supply more products); *see, e.g., Anthony's Pier Four,* 583 N.E.2d at 822 (holding that withholding approval as a pretext to force party into

changing price of underlying contract violated Chapter 93A).

Second, if we were to find that *Atkinson* does not limit Chapter 93A liability to cases with an extortionate element, but rather address Scholz' acts under the test as stated in *Anthony's Pier Four,* we still find that Chapter 93A has not been violated. That test asks whether there has been conduct " 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party." *Anthony's Pier Four,* 583 N.E.2d at 821; *see Wang Labs.,* 501 N.E.2d at 1165 (finding liability under Chapter 93A where interference with contract "constituted a willful act calculated to obtain the benefits of [the] contract ... without cost and in disregard of known contractual arrangements"). Here, the court found that Scholz knowingly breached the contract in order to gain a benefit—Ahern's share of the royalties. But that would be true of any knowing breach of a contract. The question, then, is whether the level of "rascality" is sufficient to rise to the level of a violation of Chapter 93A. We find it is not. First, while the deductions that the court deemed commercially unreasonable ate up more than half of the royalties reported, we note that Scholz did not seek to conceal the nature of the deductions: he laid them out on the Scholz Statement in varying levels of detail. Next, while Scholz has an extensive degree of control over the moneys from the third album, there has been no allegation that he did not report all of the royalties from MCA on the Scholz Statement. Evidence was presented that the number of hours spent on the album was reconstructed after the fact, but the district court did not find that the figures given were inaccurate, just that they were not deductible. Scholz' breach amounted to more than a dispute over the commercial reasonableness of certain deductions, as he

---

17. Ahern tries to argue that not only the Scholz Statement, but also Scholz' defense of this case, in which he raised numerous defenses and counterclaims, fulfill the requirement of finding a "wedge" used by Scholz to force Ahern to abandon his share of the royalties from the third album. However, the district court's findings do not discuss Scholz' conduct in defending this lawsuit, either by reference or as a basis for its conclusions. We refuse to move as far afield from the district court's findings in order to find extortionate conduct as Ahern requests. His reliance on the court's discussion of the defendant's litigation practices in *Quaker State* is misplaced, because there the defendant's prosecution of the counterclaims was raised in the complaint, and was addressed by the district court below. 884 F.2d at 1513–14.

would have us believe. Nonetheless, his acts did not rise to the level of rascality required for Chapter 93A liability.[18] Ultimately, therefore, we conclude that the district court erred as a matter of law in finding Scholz violated Chapter 93A, and reverse that holding.

## PREJUDGMENT INTEREST AND ATTORNEY'S FEES

As we have found that Scholz did not violate Chapter 93A, we need not address the parties' arguments regarding the award of attorney's fees under that statute. Nor do we weigh Ahern's cross-appeal of the district court's refusal to award prejudgment interest, since that is based on his Chapter 93A contention. *See* Mass. Gen. L. ch. 231 § 6C ("interest shall be added ... to the amount of damages, at the contract rate, if established, or at the rate of twelve percent per annum from the date of the breach or demand."). It does not apply to his breach of contract claim, as that was brought under New York law. *See Aubin v. Fudala,* 782 F.2d 287, 289 (1st Cir.1986) (noting that "[w]hen a Plaintiff secures a jury verdict based on state law, the law of that state governs the award of prejudgment interest.").

No costs on appeal to either party.

## CONCLUSION

For the reasons stated above, we *reverse* the lower court's decision regarding Chapter 93A violations, *affirm* its other holdings except on rescission, and *remand* for trial on the issue of rescission.

---

18. Both parties devote sections of their briefs to six "factors" related to Scholz' "rascality" which Scholz raises, and Ahern disputes. We note that, for the most part, they prove irrelevant because we focus here on Scholz' actions in breaching the FMA, not the nature of the relationship between the parties for the last twenty years.