Toomey, J.
INTRODUCTION
The parties in this class action suit were before the court in March of 2002 for a one-day bench trial on plaintiffs’ claim that defendants’ conduct in reducing broker commissions on insurance disability policies violated G.L.c. 93A, the Massachusetts Consumer Protection Act. For the following reasons, the plaintiffs shall prevail upon their claim.
BACKGROUND
Paul Revere sold its customers disability insurance policies that included options to purchase increased coverage on existing policies.[3] Until January 1, 1995, Paul Revere brokers received a 50% first-year commission on the exercise of such disability options, followed by up to nine years of 5% renewal commissions. In January of 1995, Paul Revere reduced the first year commission rate on disability options from 50% to 10% and increased the renewal commission rate from 5% to 10%. Based on this change in their commission rates, the operative effect of which they saw to be disadvantageous to brokers, plaintiffs ñled a class action suit claiming breach of contract and violation of G.L.c. 93A. The claims were bifurcated. After a three-week jury trial on the contract claim in March 1991, the jury returned a verdict for defendants. Trial upon the instant c. 93A claim followed.
Based on the submissions of the parties and all of the credible evidence presented at trial, the court will enter the following findings of fact.
FINDINGS OF FACT
The plaintiff class consists of several thousand insurance brokers who contracted with Paul Revere under standard form Broker Agreements. The Agreements authorized Paul Revere to “adopt new schedules of commission rates from time to time,” but provided that “rates and conditions for the payment offirst year and renewal commissions under any schedule may not be restricted or reducedfor in-force policies." (Emphasis added.) The parties have agreed that, even though the exercise of an option may have occurred substantially subsequent to the date on which the insured purchased the policy containing the option, the exercise of the option was treated as new business, and brokers would receive a “first year” commission when a disability option was in fact exercised.
The breach of contract action, which centered on the definition of an “in-force policy,” addressed whether language in the Broker Agreement, quoted supra, prohibited Paul Revere from applying new schedules of commission rates to disability options that were exercised on pre-existing policies. We may, by way of illustration, describe the contract trial as focusing on the following hypothetical question: whether, if a disability policy issued in 1988 provided for exercise of an option in 1993, the contractually mandated commission rate for the exercise of that option was the 1988 “first year” commission rate, in effect when the original policy was issued, or the 1993 “first year” commission rate, in effect when the option was exercised? The jury resolved that question in favor of the year of exercise, which was Paul Revere’s position.
In the early 1980s, Paul Revere began publishing annual broker commission schedules (also known as compensation schedules). Those schedules provided, inter alia, specific commission rates for first year and renewal policies. At that time, and up to 1991, Paul Revere treated the exercise of disability options[4] as new business and paid the compány’s standard first year commission of 55% on the exercise of such options, even if the underlying policy had been sold in a year when the base first year commission rate was less than 55%.
In 1991, Paul Revere reduced the base first year commission rate from 55% to 50%, and applied the new rate to all options exercised after January 1, 1991. Paul Revere issued a memorandum to all field office personnel stating that "when (disability) options are exercised, the premium increase is treated as a first year premium . . . [The exercise of disability options] is treated no differently than a new policy and therefore, commission rates are paid based on the current *221 year’s commission . . . schedule.” The memorandum also explained that the new 50% first year rate would govern commissions on all disability options, even if the option was being exercised on a policy issued prior to 1991, that is to say, a policy which contained options the broker had expected to yield a 55% commission rate when exercised.
Until January 1995, Paul Revere’s commission schedules never included a separate category for commissions earned upon the exercise of disability options, and brokers received the company’s standard first year commission rate in effect at the time the option was exercised. Paul Revere used marketing and informational materials to communicate to brokers that they would receive "first-year commissions” on the additional premium collected when disability options were exercised. The written materials contained such promises as “full first year commissions” and first year commissions “every time.” In fact, in an October 1, 1991 memorandum to all field office personnel, John Brady reiterated the company’s position that “when options are exercised the premium increase is treated as a first year premium. AIBs and FIOs are treated no differently than a new policy ...” (Emphasis added.) Paul Revere distributed literature to brokers that graphically depicted the sale of disability options as resulting in money literally falling out of trees. The misleading character of those assurances to the brokers is now manifest.
In late 1994, while Provident’s acquisition of Paul Revere was being negotiated, Paul Revere was facing financial difficulties, which the company described internally as “the $ 18 million challenge.” The objective of the $18 million challenge was to increase the company’s projected profits for 1995 and 1996, in order to attain profit margins “that our parent . . . expected from us. Otherwise, you would then invest your money in something else.” (Trial transcript Vol. 12, p. 119.) The company’s disability claims had increased dramatically, particularly in the physician block, and Paul Revere was looking for ways to correct the bottom line. As part of the effort to increase profitability, Paul Revere’s Brokerage Compensation Committee (“BCC”) looked at several options for reducing compensation to brokers. In late 1994, Paul Revere decided to reduce brokers’ “first year” commission rate on options exercised after January 1, 1995 to 10%, an 80% reduction.[5] It was estimated that the proposed changes in broker commissions would achieve, for Paul Revere, $4 million in cash flow savings during the first year and $4,700,000 during the second.
Consequently, in 1995, Paul Revere, for the first time, included a separate category in the commission schedule for disability options. Although the company’s standard first year commission rate (applicable to the sale of the underlying base policy) remained at 50%, the new category (applicable only to disability options) reduced the first-year commission rate on the exercise of disability options to 10%. The brokers brought this action, arguing that the 80% reduction in the commission rate paid on the exercise of disability options breached the Broker Agreements and that the arbitrary creation of a new category of “first year” commission rates for disability options, which reduced those commissions by 80%, constituted an unfair and deceptive business practice under G.L.c. 93A.
The breach of contract claim was tried to a jury, which found that defendants’ reduction in broker commissions for the exercise of disability options had not violated the Broker Agreements. Specifically, the jury expressed on the verdict slip that defendants did not “breach contracts with plaintiffs by paying commissions on the exercise of disability options under the commission schedule in effect when the option was exercised rather than the commission schedule in effect when the policy was issued.”
During discovery, defendants, asserting attorney-client privilege, repeatedly refused to make certain documents and/or conversations related to the contract change available to the plaintiffs. For example, at his deposition, Assistant General Counsel Robert A. Armstrong was instructed multiple times not to answer questions that required disclosure of attorney-client communications. The plaintiffs objected to assertion of the privilege, stating that, if Paul Revere intended to employ an “advice of counsel” defense at trial [viz, “our lawyers said we could reduce the commission rate under the contract”), plaintiffs’ inability to depose defendant’s witnesses prior to trial would effectively preclude them from conducting effective cross examination at trial, particularly in terms of impeachment. Prior to trial, defendants repeatedly assured counsel and the court that they had no intention of invoking the “advice of counsel” defense at trial.
At trial, however, during cross examination, two defense witnesses volunteered that they had relied upon the advice of counsel in applying 1995 reductions in commission rates to the exercise of disability options on existing policies.[6] Out of the presence of the jury, plaintiffs argued that defendants, via the testimony of their witnesses, had waived the privilege and that plaintiffs were, as a result, entitled to production of the documents, theretofore withheld, for purposes of cross examination. Citing the undesirability of suspending a juiy trial already in its third week of testimony, the court denied the plaintiffs’ motion to interrupt the trial to conduct further discovery. The court, however, noting that the testimony of the two defense witnesses was “hauntingly similar,” gave the jury a curative instruction and ordered the testimony struck from the record.
The court will now turn to the question of whether or not the evidence received at trial and condensed, supra, bespeaks a violation of G.L.c. 93A.
*222 RULINGS OF LAW A. The Statutory Violation
The sole question before this court is whether, in creating a new category for first year commission rates on disability options exercised after January 1, 1995, Paul Revere violated G.L.c. 93A, which condemns "[ujnfair or deceptive acts or practices in business transactions." G.L.c. 93A, §2. In determining whether a practice is unfair within the meaning of the statute, the court considers:
(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous; (3) . . . causes substantial injury [to] . . . competitors or other businessmen.
Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986). At bar, plaintiffs argue that defendants fraudulently misrepresented to plaintiffs that they would receive first year commissions on the exercise of disability options. By contrast, the issue at trial was whether plaintiffs’ Broker Agreements required Paul Revere to pay first year commissions on disability options at the rate in effect at the time the original policy issued (the brokers’ position) or at the time the option was exercised (Paul Revere’s position). The jury found for Paul Revere, and, because there was reasonable evidence at trial to support that finding, this court will not disturb the jury decision.
The jury trial was, however, limited, at bottom, to a scrutiny of Paul Revere’s contractual obligations, an inquiry much more narrow than that envisioned by G.L.c. 93A. “An ‘unfair or deceptive act or practice’ goes far beyond the scope of the common law action for fraud and deceit.” Dalis v. Buyer Advertising, Inc., 418 Mass. 220, 225 (1994). The question remains, therefore, as to whether, notwithstanding the jury’s finding of no breach of contract by Paul Revere, defendants’ conduct constituted a violation of G.L.c. 93A. It is “both possible and feasible for a judge deciding a c. 93A claim to make findings of fact that are contrary to those made by a jury on a parallel common law claim.” Kattar v. Demoulas, 433 Mass. 1, 12 (2000). And, if a judicial finding of a breach of contract would not alone warrant a finding of an unfair and deceptive trade practice under G.L.c. 93A, see Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995), the converse is also true, that is to say, the absence of a breach does not preclude a finding of a G.L.c. 93A violation. The circumstances attendant to the deceptive nature of defendants’ conduct might well justify such a finding. Id. at 42 (focus in making fairness determination is “on the nature of the .challenged conduct and on the purpose and effect of that conduct”). The result of the instant breach of contract trial does not, therefore, bar the G.L.c. 93A relief now sought by plaintiffs.
The Supreme Judicial Court has also noted that the “flexible set of guidelines as to what should be considered lawful or unlawful under G.L.c. 93A suggests that the terms ‘unfair and deceptive’ grow and change with the times . . . The legislature left the terms sufficiently open ended to embrace causes of action for which there are no common law analogues.” Nei v. Burley, 388 Mass. 306, 313 (1983). Thus, a plaintiff in a G.L.c.' 93A case “need not prove the existence of a contract, the defendant’s intent to misrepresent, or his own reliance on the misrepresentation, all traditionally issues of fact for the jury.” Id.
General Laws c. 93A prohibits all unfair and deceptive acts or practices. “An act or practice is ‘deceptive’ if it possesses ‘a tendency to deceive.’ ” Leardi v. Brown, 394 Mass. 151, 156 (1985). At bar, plaintiffs claim that, after years of repeatedly assuring brokers that they would receive a “first year commission” on the exercise of disability options, Paul Revere, in 1995, summarily and unilaterally introduced a new category of first year rates for disability options that reduced commissions on those options to 10%, while the standard first year rate remained at 50%. Plaintiffs contend that this 80% reduction in first year commission rates for the exercise of disability options constituted an unfair and deceptive business practice. This Court agrees.
In 1995, the Supreme Judicial Court abandoned the “rascality” standard for finding abusiness-to-business G.L.c. 93A, §11, violation,[7] focusing instead upon “the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L.c. 93A fairness determination.” Mass Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42 (1995). In addition, the conduct must be “ ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party." See Ahern v. Scholz, 85 F.3d 774, 799 (1996), quoting Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 466 (1991). At bar, this court is persuaded that the purpose of Paul Revere’s conduct in changing first year commissions to be paid upon the exercise of disability options was to help the company cope with an $18 million shortfall, notwithstanding that the change would work, inevitably, to the brokers’ financial detriment. The effect of the conduct was to deprive brokers of commissions that they had reasonably and rightfully expected. Defendants’ conduct was “intentionally designed to achieve undeserved benefits for the violator.” See Recoll Mgmt. Corp. v. Stone & Webster’s Eng’g Corp., 11 Mass. L. Rptr. 337, 1999 WL 1487585 at 15 (Mass. Super. Dec. 30, 1999). Although not a breach of contract, the defendants’ doings were, in the circumstances, unfair and deceptive.
Paul Revere contends that, under Ahern, plaintiffs’ G.L.c. 93A action must fail because Paul Revere disclosed the 1995 change in commission rates for dis *223 ability options at the time the change was implemented. That argument is unavailing. In its literature, dating back to at least 1985, Paul Revere repeatedly assured brokers that they would receive a “first year” commission every time a disability option was exercised on an existing policy. Because brokers had always received a standard first year commission for the exercise of disability options, the reasonable, if not compelling, understanding of the contractual arrangement was that the standard first year commission rate in effect when the option was exercised would apply. To change, without forewarning, the commission rate for disability options to 10%, while the standard first year commission rate on new policies remained at 50%, constituted a disregard of “known contractual arrangements” condemned by Ahern. There was no evidence at trial that Paul Revere ever conveyed to the brokers, in past communications, the company’s understanding that “first year” might no longer mean “first year” should the company face financial difficulties at some undetermined time in the future. Those circumstances render irresistible the inference of purposeful obfuscation by Paul Revere.
On the contract claim, the question for the jury was whether Paul Revere was obligated to pay commissions for disability options at the rate in effect when the policy was issued or when the option was exercised. The jury favored Paul Revere’s interpretation of the contract, finding that, as a matter of contract application, brokers were entitled only to the first year commission rate in effect when the option was exercised. That defendants were thus not obligated by contract to pay rates as of inception rather than rates as of option does not mean that they were not obligated, by G.L.c. 93A considerations, to honor the predictably and reasonably understood meaning of “first year” commissions payable on the exercise of disability options.
“In evaluating whether a practice is ’’unfair," “the court must assess ‘the equities between the parties,’ including what both parties knew or should have known.” Ahern v. Scholz, supra, 85 F.3d 774, 798, quoting Swanson v. Bankers Life Co., 389 Mass. 345 (1983). An imbalance of resources pervades this case, where the brokers had no choice but to accept the company’s decision regarding the 80% reduction in commission rates on options exercised on existing policies.[8] The suggestion that, if dissatisfied, brokers could take their insureds to other insurers is blind to the realities of the insurance marketplace and to the investments that “locked in” the insureds. When the brokers sold disability policies, they had a clear expectation that they would receive a standard first year commission when options on those policies were exercised. The company fostered that belief by assuring brokers in writing that they would receive a “full first year commission” every time a disability option was exercised. Paul Revere’s hands were certainly “unclean” with respect to its motivation for and implementation of the 1995 reduction in “first year” commission rates for the exercise of disability options.
Precise identification of Paul Revere’s actual motivation in redefining “first year” for disability options is, perhaps, immaterial to the analysis. Several defense witnesses asserted that Paul Revere believed that it reserved the right to change the meaning of “first year” when it suited the company’s financial purposes. If so, Paul Revere engaged in deceptive conduct by failing to communicate its belief in such definitional flexibility to the brokers, who were told only that they would receive a first year commission for the exercise of disability options and were never informed that the definition of “first year” was mutable. See Arthur D. Little v. Dooyang Corp., 979 F.Sup. 919, 925 (1997). Similarly, if Paul Revere originally intended to give brokers a standard first year commission to be paid on the exercise of disability options, promised to do so, and then decided, as a response to unexpected corporate financial pressures, to redefine “first year,” that conduct is also unfair and deceptive. Such conduct was in ‘disregard of known contractual arrangements’ (to pay a standard first year commission on the exercise of disability options) and “intended to secure benefits for the breaching party” in coping with the $18 million challenge at the brokers’ expense. See Ahern v. Scholz, 85 F.3d 774, 799 (1996), quoting Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 466 (1991).
This court is convinced, by a fair preponderance of the reliable evidence offered at both the contract and the statutory trials, that defendants have violated the provisions of G.L.c. 93A.
B. The Question of Damages
G.L.c. 93A, §11 provides:
[i]f the court finds for the petitioner, recovery shall be in the amount of actual damages, or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of section two.
Thus, liability for multiple damages is determined by the character of the defendant’s culpability. See Int’l. Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). Defendants who have committed “willful or knowing” violations of the statute are liable for multiple damages, while defendants who have committed “relatively innocent violations” are not so liable. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 780 (1986).
At trial, as noted, supra, Paul Revere officials testified repeatedly that they believed they had the right to change unilaterally the definition of “first year” commissions for certain types of policies. The decision not to communicate to the brokers Paul Revere’s understanding of its power to alter, retrospectively, the *224 commission entitlements of its brokers, constitutes a willful violation of G.L.c. 93A. See St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc., 1994 WL 879974 at 1 (Mass. Super. 1994), aff'd., 43 Mass.App.Ct. 1105 (1997), aff'd., 427 Mass. 372 (1998). Similarly, the purposeful decision by Paul Revere to change its previous commitment to pay a standard first year commission on the exercise of disability options comprises knowing conduct. The willful and knowing essence of Paul Revere’s conduct exposes it to the multiple damages contemplated by G.L.c. 93A, §11.[9]
Based upon the entirety of the evidence adduced at the trials of this matter and the reasonable inferences drawable therefrom, this court finds that Paul Revere’s conduct is of such a kind as requires the imposition of double damages under the provisions of G.L.c. 93A, §11.
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment shall enter for the plaintiffs on their G.L.c. 93A claim. Defendants shall pay to plaintiffs the difference between the amounts heretofore paid to plaintiffs by defendants and the amounts to which plaintiffs are, in fairness, entitled, as determined by this court in these proceedings, to wit, 50% first year commissions upon the exercise of disability options on policies issued prior to January 1, 1995. In addition, plaintiffs are entitled to double damages and reasonable attorneys fees.

The options included the Automatic Increase Benefit Option (AIB), which automatically increased both the amount of the monthly benefit and the cost of the premium, the Future Income Option (FIO), which gave policyholders, at certain anniversaries of the base policy, the option to elect an increase in the monthly indemnity, for which an additional premium was collected, and the Guaranteed Coverage Increase Option (GCIO), which allowed employees to purchase additional monthly disability coverage without evidence of medical insurability.

The options included riders for Automatic Increase Benefit Option (“AIB’j, Future Income Option (“FIO”) and Guaranteed Coverage Increase Option (“GCI”).

The company also increased the renewal rate on these options from 5% to 10%.

During the proceedings on April 9, 2001, in response to a question from plaintiffs’ counsel as to how Paul Revere determined that it could change the commission rates on “in-force” policies, defense witness Warren Bock testified “Mr. Akerson went to, as we discussed, to the law department, discussed with Mr. Armstrong [defendants’ in-house counsel], was told we could make the changes on policies with issue dates prior to January 1st, yes.” (Tr. 10-51.)
On the following day, April 10, 2001, defense witness John Brady volunteered during cross examination that “[W]e were advised by counsel that we couldn’t change, say, renewal rates on a policy that was in force. It was against the contract . . . [W]e were advised we can change first year rates on new business . . . That’s how we were advised. I don’t know whether it’s lawful or not, but that’s how we were advised.” (Tr. 11-91.)

That standard provided that “[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” Levings v. Forbes and Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1992).

Whether even more than a few even realized the diminution of commissions, given the less than lucid way in which Paul Revere gave notice of the abrupt change in the meaning of “first year,” is doubtful.

In making a G.L.c. 93A finding, the court may make an independent determination as to the credibility of the witnesses. See Kattar v. Demoulas, 433 Mass. 1, 12 (2000). At bar, the testimony of several company officials at trial strongly suggested that Paul Revere knew that reducing broker commissions on disability options in order to improve the company’s bottom line would deprive brokers of commissions to which they thought themselves entitled. Moreover, the “hauntingly similar” testimony of several witnesses in invoking the “advice of counsel” defense at trial raises questions as to the credibility of those witnesses and further bolsters this court’s determination that the company’s sudden, unilateral implementation of an 80% decrease in broker commissions on the exercise of disability options was both knowing and willful.