Sanders, J.
This is a class action brought by two named plaintiffs representing several thousand insurance brokers challenging a decision by the defendants to change the method by which they paid broker commissions on certain disability insurance policies. Although a jury found in favor of the defendants on the plaintiffs’ breach of contract claim, this Court (Toomey, J.) concluded following a bench trial that the defendants had violated G.L.c. 93A. The matter is now before the Court seeking clarification of its Order dated September 6,2002 (15 Mass. L. Rptr. 220), specifically the method by which actual damages should be calculated. For the following reasons, I agree with defendants’ position in substantial part.
BACKGROUND
Plaintiffs represent a class of approximately 18,000 brokers who sold disability insurance products for defendant Paul Revere Life Insurance Company (“Paul Revere”). Paul Revere brokers are compensated on a commission basis. When they sell a new policy, they receive a “first year” commission, which has historically ranged from 50 to 75 percent of the premium received on the policy sold. For every subsequent year that the policy is renewed over the first ten years, the brokers receive a “renewal” commission, which is generally much lower, ranging from 5 to 15 percent of the policy premium.
The dispute in the instant case concerns commissions earned in connection with the exercise of certain options attached to disability insurance policies. These options enable the insured to increase his disability coverage after the initial purchase of a policy. There are three types of options. The principal one is the Automatic Increase Benefits option (“AIB”) which, once exercised, automatically increases both the amount of coverage and the premium at stated intervals, unless the insured declines the increase. The second type is the Future Income Option (“FIO”), which gives policy holders the option to increase coverage at designated intervals provided they give proof of increased earnings and pay an additional premium. The third option is a Guaranteed Coverage Increase option (“GCI”), which is available to companies administering a multi-life insurance plan for their employees. The GCI allows the companies to purchase additional amounts of disability coverage corresponding to increased levels of employee earnings.
Up until Januaiy 1995, Paul Revere paid its brokers a 50 percent “first year” commission upon the exercise of any of these three options. The parties have agreed that the exercise of the option was treated as “new business” even though it was in connection with a policy issued well before the exercise date. The 50 *114 percent first year commission was then followed by nine years of a 5 percent “renewal” commission. In its marketing and informational materials, Paul Revere trumpeted the benefits to the broker resulting from this arrangement. As the Court stated in its Findings of Fact on the 93A claim, the company “graphically depicted the sales of disability options as resulting in money literally falling out of trees.”[1]
In late 1994, Paul Revere, faced with a large financial shortfall, decided to make a change. Effective February 1, 1995, it created a separate category in its commission schedule for disability options. Although the standard first year rate for newly purchased policies remained at 50 percent, the “first year” commission rate on the exercise of disability options was reduced to 10 percent. At the same time, the renewal commissions for these options were increased from five to ten percent. Faced with an 80 percent reduction in their first year commissions for disability options, the brokers instituted this class action, claiming a breach of contract and a violation of G.L.c. 93A.
The breach of contract claim alleged a violation of the Broker Agreement that each plaintiff had with Paul Revere. The Broker Agreement permitted Paul Revere to adopt new schedules of commission rates, but further provided that “rates and conditions for the payment of first year and renewal commissions under any schedule may not be restricted or reduced for in-force policies." The claim, which was tried to a jury in April 2001, centered on the definition of an “in-force” policy. The plaintiffs contended that, because the options were exercised in connection with “in-force” policies, the commissions earned upon the exercise of those options could not be changed. Paul Revere contended that, because the exercise of the option was regarded as new business, it was permitted to change the commission rate for those options even though the option was exercised in connection with a policy purchased several years before. The juiy agreed with the defendants’ position, finding in response to a special question on the verdict slip that the defendants did not “breach the contracts with plaintiffs by paying commissions on the exercise of disability options under the commission schedule in effect when the option was exercised rather than the commission schedule in effect when the policy was issued.”
The 93A claim remained, however. Following a bench trial, this Court (Toomey, J.)[2] concluded that the defendants’ conduct was nevertheless unfair and deceptive. Without questioning the jury’s decision, Judge Toomey concluded that “the change, without forewarning . . . constituted a disregard of ‘known contractual arrangements’ ” and was intended to achieve undeserved benefits for the company to the detriment of the brokers. See Ahern v. Scholz, 85 F.3d 799 (1st Cir. 1996), relying on Anthony’s Pier Four Inc. v. HBC, Associates, 411 Mass. 451 (1991). The Court found that the defendants had engaged in deceptive conduct by failing to tell brokers that the company “reserved the right to change the meaning of‘first year’ whenever it suited the company’s financial purposes ...” Finally, Judge Toomey concluded that the conduct of the defendants was a wilful and knowing violation of Chapter 93A, thus entitling plaintiffs to recover, pursuant to G.L.c. 93A §11, double the amount of actual damages. As to the amount of actual damages, the Court ordered the defendants to pay the plaintiffs “the difference between the amounts heretofore paid to plaintiffs by defendants and the amount to which plaintiffs are, in fairness, entitled, as determined by this court in these proceedings, to wit, 50% first year commissions upon the exercise of disability-options on policies issued prior to January 1, 1995.”
The matter is now before the Court for clarification of that Order.
DISCUSSION
One of defendants’ requests for clarification can be easily disposed of. This Court does not read Judge Toomey’s decision to apply only to AIBs and FIOs and not to GCIs. Although he made reference (in connection with his finding of deceptive conduct) to a 1991 memorandum authored by a Paul Revere employee which specifically discussed AIBs and FIOs (see Jury Trial Ex. 29), he did not limit his holding to only those two types of options. Indeed, in setting forth the context for his findings, he specifically referenced the types of options at issue (in footnote 3 of the decision), and expressly included GCIs. Nowhere in the opinion is there an indication that the Court distinguished between the different types of options, or found that defendants had engaged in wrongdoing only as to AIBs and FIOs. Whether the Court’s decision is supported by the evidence is for an appellate court to consider.
With regard to the primary issue before the Court— how damages on the 93A count shall be calculated— defendants agree that the Order is quite clear that they must pay the plaintiff class the difference between the 50 percent “first year” commission they received on the exercise of disability options prior to February 1, 1995 and the 10 percent “first year” commission they received after the change took affect.[3] Defendants argue, however, that that amount must be offset by the increase in renewal commissions which went into effect at the same time. In essence, they contend that the remedy which is appropriate in this case should place the plaintiffs in the position that they would have occupied had no change in the commission schedule been made. Not to make the offset would result in an undeserved windfall, it is argued. I am persuaded by defendants’ reasoning.
Chapter 93A states that “recovery shall be in the amount of actual damages.” As the Court stated in Kattar v. Demoulas, 433 Mass. 1,15 (2000):
A fundamental principle on which the rule of damages is based is compensation. Compensation is that amount of money that reasonably will make *115 the injured party whole. Compensatory damages may not exceed that amount. Anything beyond that amount is a windfall.
Thus, in the case of a breach of contract, the goal is to place the injured parly in the same position he would have been in if the contract had been performed. Abrams v. Reynolds Metal Co., 340 Mass. 704, 708 (1960). Where the plaintiff received some benefit as a result of the breach, then that benefit necessarily reduces his damages. See, e.g., Restatement (Second) Contracts §347(e) (1981). The same general principle applies in a tort case, provided that the benefit is not from some collateral source. As stated in the Restatement (Second) Torts §920 (1979):
Where the defendant’s tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that it is equitable.
Although that would not include benefits of uncertain value which are foisted upon tort victims against their will, it would require that an adjustment be made for clearly defined benefits to the plaintiffs which the defendant would not have conferred in the absence of the wrongdoing.
Applying these general principles, courts have routinely adjusted damages by taking into account expenses which the plaintiff would have incurred (or that the defendant would not have incurred) if the wrong had not been committed, or by reducing recovery to reflect amounts that plaintiff would not have received in the absence of the conduct at issue. See e.g. Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 28 (1997) (plaintiffs recovery for lost profits reduced by certain out-of-pocket expenses of defendant incurred in connection with the agreement which was breached); Smith v. Office of Personnel Management, 778 F.2d 258, 263 (5th Cir. 1985) (plaintiffs damages in ADEA action were reduced by amounts he received from defendant in disability compensation); Olivas v. United States, 506 F.2d 1158, 1164 (9th Cir. 1974) (damages against government under Federal Tort Claims Act were reduced by payments to plaintiff under workmen’s compensation policy paid for by government); Naton v. Bank of California, 649 F.2d 691, 700 (9th Cir. 1981) (case remanded to allow offset for layoff allowances); Munnelly v. Memorial Sloan Kettering Cancer Center, 741 F.Sup. 60, 62 (S.D.N.Y. 1990) (damages in age discrimination action reduced by amounts that plaintiff received in accumulated sick leave and vacation pay benefits following his discharge). Courts in these cases have reasoned that, where the wrong itself creates a benefit that would not have existed but for the wrongful conduct, then the damages should be reduced to the extent of the benefit received. See Ronson v. Talesnick, 33 F.Sup.2d 347, 354 (D.N.J. 1999). Not to make such an offset would place the plaintiff in a better position than he would have occupied if no wrong had been committed, thus exceeding the “make-whole” purpose of compensatory damages.
Turning to the case before the Court, plaintiffs do not dispute that the increase in renewal commissions was part and parcel of the same decision made by Paul Revere which led to the decrease in first year commissions. Nor is there any evidence before this Court that the company would have increased these renewal commissions on disability options in the absence of the decrease in first year commissions. Indeed, quite the contrary appears to be true. As the defendants point out, an increase in renewal commissions to 10 percent for each of the nine years after the year in which the option was exercised, without a corresponding decrease in the first year commissions, would mean that brokers would receive 140 percent of one years’ premium generated by each option exercise. That is considerably more than the 95 percent of a single year’s premium that each broker would have received if no change had been made. To award damages based simply on the difference between the first year commission in effect before and after February 1, 1995, without correspondingly adjusting the renewal commissions to pre-1995 levels would thus place the plaintiffs in a better position than they would have occupied had no wrong occurred. That does not comport with the goal of compensatory damages nor the general principles set forth above.
Plaintiffs’ argument that defendants are in effect asserting a claim for restitution misses the point. Defendants are not seeking to recoup amounts that were wrongfully obtained by the plaintiffs so as to prevent them from being unjustly enriched (the classic definition of restitution). Rather, defendants’ claim goes to the methodology that this Court should adopt in determining plaintiffs’ actual damages. The question is not whether plaintiffs should be required to return certain amounts, but rather how much money they should receive to fairly compensate them for the wrong done. I am similarly unpersuaded by plaintiffs’ assertion that this offset is one which must have been affirmatively pleaded. The burden is on the plaintiffs to establish those damages actually caused be defendants’ wrongdoing. The adjustment that the defendants urge this Court to make need not be asserted as an affirmative defense or counterclaim since it relates to an element of plaintiffs’ case.
The defendants did assert a conditional counterclaim for restitution or recoupment in connection with the breach of contract claim. Plaintiffs argue that the defendants’ unexplained failure to assert a similar counterclaim with respect to the Chapter 93A count is some indication that they realized how untenable their position was. However, this counterclaim (ultimately abandoned by the defendants) is entirely different from the arguments that defendants assert here *116 with respect to the calculation of damages. As the Court reads the counterclaim, it alleges that, if it were ultimately found that the commission schedule for options that Paul Revere was bound by its Broker Agreement to follow is that which was in effect when the original policy was issued, then the company need only pay renewal commissions on disability options for the nine years after that first year in which the underlying policy was issued, regardless of when the option was exercised. In other words, if an option was exercised during that nine-year period, the clock does not start running all over again for purposes of calculating how long the broker will receive renewal commissions. In contrast, the issue now before the Court is whether the plaintiffs’ damages should be calculated by simply putting back into place the pre-1995 commission schedule for both first year and renewal commissions, since it was the decision to change that schedule and create a separate category of commissions applicable only to disability options which was the wrong that Judge Toomey found to have occurred. Under the original commission schedule, brokers are entitled to receive a “first year” commission (of 50 percent) on the date that the option is exercised, followed by nine years of renewal commissions (at 5 percent) following that first year. The date on which the underlying policy was issued is not relevant.
Plaintiffs also argue that, in light of Judge Toomey’s finding that the defendants committed a wilful and knowing violation of Chapter 93A, defendants are not entitled, as a matter of equity, to the adjustment in damages that they seek. Defendants, however, are not seeking equitable relief, nor does this Court perceive the adjustment that they seek with regard to damages as one which turns on whether the defendant has “unclean hands,” since any tortfeasor necessarily has committed a legal wrong. Moreover, the Court has already penalized the defendants for their wilful misconduct by ordering that the actual damages in this case be doubled. To calculate actual damages based on considerations relevant to the decision to multiply them would penalize the defendants twice over.
Finally, plaintiffs suggest that they would have received higher renewal commissions anyway because of changes made in the commission schedules after a 1997 merger of the Paul Revere and Provident Companies. But this appears to flatly contradict the plaintiffs’ statement, through counsel, in opposition to this Motion that “for policies that have remained in force, the commission schedule in force when the options were exercised controls the commission rate, not the Provident or UnumProvident commission schedules that have applied to option exercised since January 1, 1998 [the date of the merger].” Sep. 14 of Plaintiffs’ Memorandum on Calculation of Damages. Moreover, as the Court understands the evidence, the renewal rate paid for the exercise of disability options is based on the rate in effect on the date of exercise, and is essentially “locked in.” Thus, if no change had been made in 1995 in connection with disability options, brokers would be receiving first year and renewal commission based on pre-1995 commission schedules, without regard to any changes made in rates following the merger.
For the reasons set forth above, I therefore agree with the defendants that some adjustment should be made in the damages calculation to take into account the increase in renewal commissions for disability options from five to ten percent, effective February 1, 1995. That offset should include renewal commissions already paid to brokers in connection with options exercised after February 1, 1995, as well as those renewal commissions which, to a reasonable degree of certainty, will be paid into the future. Defendants have placed before the Court an affidavit setting forth a method for calculating that amount, based on certain assumptions regarding lapse rates. It seems only fair, however, that plaintiffs should be allowed to challenge these assumptions at an evidentiary hearing; moreover, this Court needs to be convinced that the calculations outlined in the affidavit have some support. Indeed, although Judge Toomey decided liability on the 93A claim, he specifically left open the possibility that further hearing could be required to determine the amount of damages. Such a hearing will be necessary if the parties cannot agree.
CONCLUSION AND ORDER
Accordingly, for all the foregoing reasons, this Court concludes that defendants are entitled to have damages calculated in a manner which accounts for the increase in renewal commissions on disability options (from 5 to 10 percent for nine years) which was part of the February 1, 1995 decision that this Court has found to be unlawful. That benefit, which brokers have already received and which they can reasonably be expected to receive, offsets the losses they suffered as a result of the reduction of first year commissions (from 50 percent to 10 percent). Losses are to be calculated for all three types of options, including GCIs.
If the parties cannot agree in their calculations as to specific figures, they will promptly notify the Court and an evidentiary hearing concerning damages will be scheduled.

 The opinion is reported at 2002 WL 31097684, 15 Mass.L.Rptr. 220 (2002); it is also attached as an exhibit to several of the relevant pleadings.

 Judge Toomey presided over all proceedings in this case until his death in November 2002. This judge was specially assigned the case in or about January 2003.

 The parties have reached agreement as to how that figure will be calculated, taking into account certain differences on first-year commissions among different policies. They have also agreed that damages are limited to the period between February 1, 1995 and December 31, 1997 (when the challenged commission change ended), and that statutory prejudgment interest shall be calculated from the date that the lawsuit was filed (June 1, 1997).